

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

NIGHT BOX
FILED

UCT 18 2002

**CASE NO. 00-1951-CIV-LENARD/TURNOFF**

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

M SECURITIES INVESTMENT, INC., a
Florida corporation[1], d/b/a HOWARD
GARY & COMPANY,

               Plaintiff,

v.

MIAMI-DADE COUNTY, a political
subdivision of the State of Florida,
MIAMI-DADE COUNTY EXPRESSWAY
AUTHORITY, .GRIGSBY AND
ASSOCIATES, INC., a California
corporation, DAIN RAUSCHER, INC.,
f/k/a, RAUSCHER PIERCE REFSNES,
INC., a Minnesota corporation, GBR
FINANCIAL PRODUCTS COMPANY, a
foreign corporation, RICE FINANCIAL
PRODUCTS COMPANY, .CALVIN
GRIGSBY, J. DONALD RICE,

               Defendants.

_____/

## THIRD AMENDED COMPLAINT IN CONSOLIDATED ACTION

Plaintiff M Securities Investment, Inc., d/b/a Howard Gary & Co. ("Howard Gary &

Co.") sues MIAMI-DADE COUNTY, a political subdivision of the State of Florida

("County"), MIAMI-DADE COUNTY EXPRESSWAY AUTHORITY ("MDX"), GRIGSBY

AND ASSOCIATES INC. ("Grigsby"), DAIN RAUSCHER, INC., f/k/a, RAUSCHER

PIERCE REFSNES, INC., ("Rauscher"), GBR FINANCIAL PRODUCTS COMPANY, a

foreign corporation ("GBR"), RICE FINANCIAL PRODUCTS COMPANY ("Rice

---

[1]    Due to a scrivener's error, M Securities Investment, Inc. was previously erroneously referred to as
"M Securities and Investments, Inc." That error has been corrected in this amended complaint.

CASE NO. 00-1951-CIV-LENARD/TURNOFF

Financial"), CALVIN GRIGSBY ("Grigsby"), J. DONALD RICE ("Rice"), and for cause of action, alleges the following:

## JURISDICTION AND VENUE

1.      This is action is brought pursuant to statutes of the United States, specifically, 28 U.S.C. §§ 1331, 1343, *et seq.,* and 42 U.S.C. §§ 1981 and 1983.  This Court has supplemental jurisdiction of Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) in as much as the state law claims form a part of the same case or controversy as the federal claims.  Venue is proper as all of the actions complained of occurred within the territorial jurisdiction of the Court.

## DESCRIPTION OF THE PARTIES

2.      Plaintiff, M Securities Investment, Inc., d/b/a Howard Gary & Company ("Howard Gary & Co.""), is a Florida corporation with its principal place of business in Miami, Miami-Dade County, Florida.   Plaintiff's principals and majority owners are African-American citizens of the United States.

3.      Howard Gary & Co. is a registered securities broker-dealer registered with the Securities and Exchange Commission ("SEC"), and a member of the National Association of Securities Dealers, Inc. ("NASD"), and the Municipal Securities Rulemaking Board.   Howard Gary & Co. is an African-American majority owned company and one of its principals is Howard Gary, an African-American citizen of the United States.

4.      In the years leading up to 1996 and during 1996, Howard Gary & Co. and its principals were highly regarded locally and nationally in the field of public financing and the sale of municipal securities.

2

CASE NO. 00-1951-CIV-LENARD/TURNOFF

5.     Defendant, Miami-Dade County, Florida f/k/a Metropolitan Dade County, Florida ("County"), is a county and political subdivision of the State of Florida.  A body of elected Commissioners that constitute the Board of County Commissioners and an elected executive Mayor governs the County.

6.     Defendant, Miami-Dade County Expressway Authority f/k/a Dade County Expressway Authority ("MDX"), is an independent governmental agency of Miami-Dade County, Florida and the State of Florida established pursuant to the Florida Expressway Authority Act.   MDX is responsible for administering several expressway facilities located within Miami-Dade County, Florida.  A body comprised of members appointed, respectively, by the Governor of the State of Florida, the Board of County Commissioners, and one member who shall be the local district secretary of the Florida Department of Transportation governs MDX.

7.     Defendant, Grigsby & Associates, Inc., is a California corporation ("Grigsby Inc."), whose principal place of business is in the State of California, that is registered to do business in the State of Florida, and maintains a local place of business in Miami-Dade County, Florida.  Grigsby was formerly named Grigsby Brandford & Company, and prior to that, named Grigsby Brandford Powell, Inc.  Grigsby's principal is Calvin Grigsby ("Grigsby").

8.     Defendant Grigsby is an individual and based upon information and belief is residing in and a citizen of the State of California. Defendant Grigsby is a principal of Grigsby Inc. and GBR.

9.     At all times material herein, Grigsby owned a majority interest in Grigsby Inc.  Grigsby also used Grigsby Inc. to facilitate criminal activities including bribery of

3

public officials in order to obtain designation as an underwriter in municipal bond offerings for Grigsby Inc. The nature of the relationship of Grigsby to Grigsby Inc. was such, and their activity was so personalized and unified, that Grigsby and Grigsby Inc. are the alter egos, one to the other, for all material purposes as pertain to the allegations described herein.

10.     Defendant GBR Financial Products Company ("GBR") is a company whose principal place of business is in the State of New York. At times material herein, Grigsby and J. Donald Rice were principals of GBR.  GBR is based upon information and belief an entity holding a majority and controlling ownership interest in various other entities including but not limited to GB Derivative Products, Co., L.P., GBDB Holdings, L.P., and GBDP, L.P. Calvin Grigsby and J. Donald Rice ("Rice"), in order to facilitate interest rate swap transactions in municipal securities offerings, collectively created all these companies.

11.     Defendant Rice Financial Products Company ("Rice Financial") is a company whose principal place of business is in the State of New York. Rice is a principal of Rice Financial. Rice Financial is based upon information and belief an entity holding a majority and controlling ownership interest in various other entities including but not limited to GBR, GB Derivative Products, Co. L.P., GBDB Holdings, L.P., and GBDP, L.P. Rice, in order to facilitate interest rate swap transactions in municipal securities offerings, collectively created all these companies.

12.     Defendant Rice is an individual and based upon information and belief is residing in and a citizen of the State of New York. Defendant Rice is a principal of GBR and Rice Financial.

4

13.    At all times material herein, Rice owned a majority or controlling interest in GBR and Rice Financial. The nature of the relationship of Rice to GRB and Rice Financial was such, and their activities were so personalized and unified, that Rice, GBR and Rice Financial are the alter egos, one to the others, for all material purposes as pertain to the allegations described herein.

14.    Defendant Dain Rauscher, Inc. is a Minnesota corporation ("Rauscher"), whose principal place of business is in the State of Minnesota and that is registered to do business in the State of Florida, and maintains a local place of business in Miami-Dade County, Florida.  Rauscher was formerly named Rauscher Pierce Refsnes, Inc.

15.    During 1996, Rauscher served as financial advisor to the County and MDX in the sale of municipal securities and other public financing and budget matters.

### FACTS COMMON TO ALL COUNTS

16.    At all times material herein, James Burke ("Burke") was a member and Commissioner of the Board of County Commissioners for Miami-Dade County, Florida, and Chairman of the County's Finance Committee.  As such, he was the Commissioner who exerted the greatest influence and control over the issuance of County bonds, the decisions of County finance directors, and the selection of County bond underwriters and County financial advisors.

17.    At all times material herein, William Hardemon ("Hardemon") was Burke's aide.

18.    During on or about the summer of 1996, Grigsby, Burke, Grigsby, Inc., and Hardemon engaged in an extortion and bribery scheme ("the scheme"). The aim of the scheme was to extort bond company officers and representatives and to use the

5

extorted funds to bribe County representatives and elected officials.  The bribes would then be used to obtain designation of Grigsby, Inc. as underwriter in County bond offerings and to further obtain lucrative underwriting fees and commissions.

19.    In furtherance of the scheme, those involved approached and solicited Howard Gary and Howard Gary and Co., to participate in the scheme.  Specifically, all involved were seeking to extort money from Howard Gary & Co. for themselves to assist in the bribery of public officials in connection with the underwriting of the issuance of municipal securities and other underwriting transactions in which Howard Gary & Co. was then involved.

20.    Instead, Howard Gary disclosed the extortion and bribery scheme and identified the participants of the same to the Federal Bureau of Investigation and other federal prosecution entities.

21.    As a citizen cooperating in the criminal investigation by the federal government of the extortion and bribery scheme, Howard Gary agreed to feign participation in the extortion and bribery scheme so as to assist authorities in the criminal investigation.

22.    On or about September 1996, Howard Gary's activities as a citizen cooperating and assisting authorities in the criminal investigation by the federal government of the extortion and bribery scheme were reported in the media.  The media reports were inaccurate as regarded Howard Gary's and Howard Gary & Co.'s role in the investigation.

23.    Beginning on or about September 1996, there was local and national business media coverage that inaccurately characterized Howard Gary & Co. of being a

target or subject of the federal criminal investigation into the extortion and bribery activities of Grigsby, Burke, Grigsby, Inc. and Hardemon.

24.    Thereafter, at the request of the County, Howard Gary & Co. obtained written and oral confirmation from the federal government that specifically stated that Howard Gary & Co. was not the subject or target of a criminal investigation. This confirmation was provided to the County, MDX and Rauscher.   (Copy of letter attached as Exhibit A)

### COUNT I – 42 U.S.C. § 1983 Violation by County

25.    Plaintiff realleges and incorporates by reference all the allegations contained in paragraph one through twenty five with the same force and effect as if set forth herein.

26.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution guarantees to all citizens the full and equal benefit of equal rights under the law irrespective of race.  Violations of the Equal Protection Clause are actionable claims pursuant to 42 U.S.C. § 1983.

27.    County Ordinances No. 94-158 and No. 95-37 are attached as Exhibit B & C, respectively.  These ordinances provided procedures for selection of underwriting firms for negotiated bond transactions.  The procedures further provided that underwriting firms would be assigned to various teams from which they would then be entitled to be selected as underwriters for County bond offerings.

28.    Pursuant to these ordinances the County established various teams of underwriters that formed a pool of County underwriters.  Howard Gary & Co. was designated a member of a pool of underwriters contracted to participate as an

underwriter in municipal securities issued by the County and MDX.  Only members of the County underwriting pool could serve as underwriters in municipal securities by the County offerings issued by MDX.

29.    Pursuant to County Resolution No. R-922-96, Howard Gary & Co. was designated a member of an authorized underwriting team in the issuance of municipal securities involving the Seaport ("Seaport bond"). As such, Howard Gary & Co. was contracted to participate as an underwriter in Seaport bond. (Resolution is attached as Exhibit D)

30.    On or about October 1996, the County removed or undesignated Howard Gary & Co. from the underwriting team contracted to participate as an underwriter in Seaport bond offering.

31.    The County's removal of Howard Gary & Co. from the underwriting team in the Seaport bond offering was accomplished by a majority vote and resolution of the Board of County Commissioners and constituted state action under color of law.

32.    During 1996, several other non-minority owned securities broker-dealer firms, including Rauscher, Smith Barney, Merrill Lynch, PaineWebber, Prudential, AG Edwards and others were also the subject and target of publicized allegations of misconduct relating to their activities as municipal underwriters.

33.    During 1996 and thereafter, the other non-minority owned securities broker-dealer firms were identified in local and national media as being engaged in misconduct relating to their activities as municipal underwriters.

34.    The misconduct of the non-minority owned securities broker-dealer relating to their activities as municipal underwriters firms was well known to the County.

8

Indeed the misconduct of some non-minority owned securities broker-dealers related to their activities as municipal underwriters for the County.

35.    Non-minority owned securities broker-dealer firms were not removed from their duties as underwriters on County underwriting teams based upon accusations of misconduct contained in local media or national business media.

36    The removal of Howard Gary & Co. denied equal protection under the law as enjoyed by non-minority owned securities broker-dealer firms. This removal caused Howard Gary & Co. damages and the County's actions were the proximate cause of Howard Gary & Co.'s damages.

WHEREFORE Plaintiff demands compensatory damages and attorneys fees against County.

### COUNT II - 42 U.S.C. § 1981 Against  County

37.    Plaintiff realleges and incorporates by reference all the allegations contained in paragraph one through twenty five with the same force and effect as if set forth herein.

38.    County Ordinances No. 94-158 and No. 95-37 are attached as Exhibit B & C, respectively.  These ordinances provided procedures for selection of underwriting firms for negotiated bond transactions.  The procedures further provided that underwriting firms would be assigned to various teams from which they would then be entitled to be selected as underwriters for County bond offerings.

39.    Pursuant to these ordinances the County established various teams of underwriters that formed a pool of County underwriters.  Howard Gary & Co. was designated a member of a pool of underwriters contracted to participate as an

underwriter in municipal securities issued by the County and MDX.  Only members of the County underwriting pool could serve as underwriters in municipal securities by the County offerings issued by MDX.

40.    Pursuant to County resolution R-922-96, Howard Gary & Co. was designated a member of an authorized underwriting team in the issuance of municipal securities involving the Seaport ("Seaport bond"). As such, Howard Gary & Co. was contracted to participate as an underwriter in Seaport bond.  (Attached as Exhibit D)

41.    On or about October 1996, the County removed or undesignated Howard Gary & Co. from the underwriting team contracted to participate as an underwriter in Seaport bond offering.

42.    The County's removal of Howard Gary & Co. from the underwriting team in the Seaport bond offering was accomplished by a majority vote and resolution of the Board of County Commissioners in Resolution No. R-922-96.

43.    During 1996, several other non-minority owned securities broker-dealer firms, including Rauscher, Smith Barney, Merrill Lynch, PaineWebber, Prudential, AG Edwards and others were also the subject and target of publicized allegations of misconduct relating to their activities as municipal underwriters.

44.    During 1996 and thereafter, the other non-minority owned securities broker-dealer firms were identified in local and national media as being engaged misconduct relating to their activities as municipal underwriters.

45.    The misconduct of the non-minority owned securities broker-dealer relating to their activities as municipal underwriters firms was well known to the County.

Indeed the misconduct of some non-minority owned securities broker-dealers related to their activities as municipal underwriters for the County.

46.     Non-minority owned securities broker-dealer firms were not removed from their duties as underwriters on County underwriting teams based upon accusations of misconduct contained in local media or national business media.

47.     The action of removing Howard Gary & Co., an African-American majority owned firm, from the underwriting team in the Seaport bond, was based on race and denied Howard Gary & Co. the right to make and enforce contracts in the same manner afforded to non-minority firms.

48.     Howard Gary & Co., an African-American majority owned firm, was denied the full and equal benefit of all laws and proceedings as enjoyed by non-minority owned securities broker-dealer firms. This denial caused Howard Gary & Co. damages and the County's actions were the proximate cause of Howard Gary & Co.'s damages.

WHEREFORE, Plaintiff demands compensatory damages and attorneys fees against County.

### COUNT III - Breach of Contract Against County

49.     Plaintiff realleges and incorporates by reference all the allegations contained in paragraph one through twenty five with the same force and effect as if set forth herein.

50.     County Ordinances No. 94-158 and No. 95-37 are attached as Exhibit B & C, respectively.   These ordinances provided procedures for selection of underwriting firms for negotiated bond transactions.   The procedures further provided that

11

CASE NO. 00-1951-CIV-LENARD/TURNOFF

underwriting firms would be assigned to various teams from which they would then be entitled to be selected as underwriters for County bond offerings.

51.     Pursuant to these ordinances the County established various teams of underwriters that formed a pool of County underwriters.  Howard Gary & Co. was designated a member of a pool of underwriters contracted to participate as an underwriter in municipal securities issued by the County and MDX.  Only members of the County underwriting pool could serve as underwriters in municipal securities by the County offerings issued by MDX.

52.     Pursuant to County resolution R-922-96, Howard Gary & Co. was designated a member of an authorized underwriting team in the issuance of municipal securities involving the Seaport ("Seaport bond"). As such, Howard Gary & Co. was contracted to participate as an underwriter in Seaport bond.

53.     As a result of its designation as a member of the underwriting team in the Seaport bond, Howard Gary & Co. had a contract with the County for the sale of the bonds.

54.     Howard Gary & Co. began to perform its obligations under the contract to sell the Seaport bonds.

55.     The County unilaterally rescinded its designation of Howard Gary & Co. as a member of the underwriting team in the Seaport bond, thereby breaching its contract with Howard Gary & Co.

56.     Howard Gary & Co. was damaged by the County's unilateral rescission and breach and caused Howard Gary & Co. damages and the County's actions were the proximate cause of Howard Gary & Co.'s damages.

CASE NO. 00-1951-CIV-LENARD/TURNOFF

WHEREFORE Plaintiff seeks compensatory damages against County.

**COUNT IV – 42 U.S.C. § 1983 Against County**

57.     Plaintiff realleges and incorporates by reference all the allegations contained in paragraph one through twenty five with the same force and effect as if set forth herein.

58.     The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution guarantees to all citizens the full and equal benefit of equal rights under the law irrespective of race.   Violations of the Equal Protection Clause are actionable claims pursuant to 42 U.S.C. § 1983.

59.     County Ordinances No. 94-158 and No. 95-37 are attached as Exhibit B & C, respectively.   These ordinances provided procedures for selection of underwriting firms for negotiated bond transactions.   The procedures further provided that underwriting firms would be assigned to various teams from which they would then be entitled to be selected as underwriters for County bond offerings.

60.     Pursuant to these ordinances the County established various teams of underwriters that formed a pool of County underwriters.   Howard Gary & Co. was designated a member of a pool of underwriters contracted to participate as an underwriter in municipal securities issued by the County and MDX.   Only members of the County underwriting pool could serve as underwriters in municipal securities by the County offerings issued by MDX.

61.     Pursuant to County resolution, Howard Gary & Co. was designated a member of an authorized underwriting team in the issuance of municipal securities involving the Water and Sewer Department ("Water and Sewer bond"). As such,

13

Howard Gary & Co. was contracted to participate as an underwriter in Water and Sewer bond.

62.     On or about October 1996, the County removed or undesignated Howard Gary & Co. from the underwriting team contracted to participate as an underwriter in Water and Sewer bond offering.

63.     The County's removal of Howard Gary & Co. from the underwriting team in the Water and Sewer bond offering was accomplished by a majority vote and resolution of the Board of County Commissioners and constituted state action under color of law.

64.     During 1996, several other non-minority owned securities broker-dealer firms, including Rauscher, Smith Barney, Merrill Lynch, PaineWebber, Prudential, AG Edwards and others were also the subject and target of publicized allegations of misconduct relating to their activities as municipal underwriters.

65.     During 1996 and thereafter, the other non-minority owned securities broker-dealer firms were identified in local and national media as being engaged misconduct relating to their activities as municipal underwriters.

66.     The misconduct of the non-minority owned securities broker-dealer relating to their activities as municipal underwriters firms was well known to the County. Indeed the misconduct of some non-minority owned securities broker-dealers related to their activities as municipal underwriters for the County.

67.     Non-minority owned securities broker-dealer firms were not removed from their duties as underwriters on County underwriting teams based upon accusations of misconduct contained in local media or national business media.

14

CASE NO. 00-1951-CIV-LENARD/TURNOFF

68.     Howard Gary & Co. was denied equal protection of law as enjoyed by non-minority owned securities broker-dealer firms. This denial caused Howard Gary & Co. damages and the County's actions were the proximate cause of Howard Gary & Co.'s damages.

WHEREFORE, Plaintiff seeks compensatory damages and attorneys fees against County.

## COUNT V - 42 U.S.C. § 1981 Against County

69.     Plaintiff realleges and incorporates by reference all the allegations contained in paragraph one through twenty five with the same force and effect as if set forth herein.

70.     County Ordinances No. 94-158 and No. 95-37 are attached as Exhibit B & C, respectively.  These ordinances provided procedures for selection of underwriting firms for negotiated bond transactions.   The procedures further provided that underwriting firms would be assigned to various teams from which they would then be entitled to be selected as underwriters for County bond offerings.

71.     Pursuant to these ordinances the County established various teams of underwriters that formed a pool of County underwriters.  Howard Gary & Co. was designated a member of a pool of underwriters contracted to participate as an underwriter in municipal securities issued by the County and MDX.  Only members of the County underwriting pool could serve as underwriters in municipal securities by the County offerings issued by MDX.

72.     Pursuant to County resolution, Howard Gary & Co. was designated a member of an authorized underwriting team in the issuance of municipal securities

15

Case 1:00-cv-01951-JAL  Document 166  Entered on FLSD Docket 10/21/2002  Page 16 of 98

CASE NO. 00-1951-CIV-LENARD/TURNOFF

involving the Water and Sewer Department ("Water and Sewer bond"). As such, Howard Gary & Co. was contracted to participate as an underwriter in Water and Sewer bond.

73.     On or about October 1996, the County removed or undesignated Howard Gary & Co. from the underwriting team contracted to participate as an underwriter in Water and Sewer bond offering.

74.     The County's removal of Howard Gary & Co. from the underwriting team in the Water and Sewer bond offering was accomplished by a majority vote and resolution of the Board of County Commissioners.

75.     During 1996, several other non-minority owned securities broker-dealer firms, including Rauscher, Smith Barney, Merrill Lynch, PaineWebber, Prudential, AG Edwards and others were also the subject and target of publicized allegations of misconduct relating to their activities as municipal underwriters.

76.     During 1996 and thereafter, the other non-minority owned securities broker-dealer firms were identified in local and national media as being engaged misconduct relating to their activities as municipal underwriters.

77.     The misconduct of the non-minority owned securities broker-dealer relating to their activities as municipal underwriters firms was well known to the County. Indeed the misconduct of some non-minority owned securities broker-dealers related to their activities as municipal underwriters for the County.

78.     Non-minority owned securities broker-dealer firms were not removed from their duties as underwriters on County underwriting teams based upon accusations of misconduct contained in local media or national business media.

79.    The action of removing Howard Gary & Co., an African-American majority owned company, from the underwriting team in the Water and Sewer bond, was on the basis of race and denied Howard Gary & Co. the right to make and enforce contracts in the same manner afforded to non-minority firms.

80.    Howard Gary & Co., an African-American majority owned company, was denied the full and equal benefit of all laws and proceedings as enjoyed by non-minority owned securities broker-dealer firms. This denial caused Howard Gary & Co. damages and the County's actions were the proximate cause of Howard Gary & Co.'s damages.

WHEREFORE, Plaintiff seeks compensatory damages and attorneys fees against County.

## COUNT VI - Breach of Contract Against County

81.    Plaintiff realleges and incorporates by reference all the allegations contained in paragraph one through twenty five with the same force and effect as if set forth herein.

82.    County Ordinances No. 94-158 and No. 95-37 are attached as Exhibit B & C, respectively.   These ordinances provided procedures for selection of underwriting firms for negotiated bond transactions.   The procedures further provided that underwriting firms would be assigned to various teams from which they would then be entitled to be selected as underwriters for County bond offerings.

83.    Pursuant to these ordinances the County established various teams of underwriters that formed a pool of County underwriters.   Howard Gary & Co. was designated a member of a pool of underwriters contracted to participate as an underwriter in municipal securities issued by the County and MDX.  Only members of

the County underwriting pool could serve as underwriters in municipal securities by the County offerings issued by MDX.

84.     Pursuant to County resolution, Howard Gary & Co. was designated a member of an authorized underwriting team in the issuance of municipal securities involving the Water and Sewer bond. As such, Howard Gary & Co. was contracted to participate as an underwriter in Seaport bond.

85.     As a result of its designation as a member of the underwriting team in the Water and Sewer bond, Howard Gary & Co. had a contract with the County for the sale of the bonds.

86.     Howard Gary & Co. began to perform its obligations under the contract to sell the Water and Sewer bonds.

87.     The County unilaterally rescinded its designation of Howard Gary & Co. as a member of the underwriting team in the Water and Sewer bond, thereby breaching its contract with Howard Gary & Co.

88.     Howard Gary & Co. was damaged by the County's unilateral rescission and breach and caused Howard Gary & Co. damages and the County's actions were the proximate cause of Howard Gary & Co.'s damages.

WHEREFORE, Plaintiff seeks compensatory damages against County.

### COUNT VII – 42 U.S.C. § 1983 Against County

89.     Plaintiff realleges and incorporates by reference all the allegations contained in paragraph one through twenty five with the same force and effect as if set forth herein.

CASE NO. 00-1951-CIV-LENARD/TURNOFF

90.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution guarantees to all citizens the full and equal benefit of equal rights under the law irrespective of race.   Violations of the Equal Protection Clause are actionable claims pursuant to 42 U.S.C. § 1983.

91.    County Ordinances No. 94-158 and No. 95-37 are attached as Exhibit B & C, respectively.   These ordinances provided procedures for selection of underwriting firms for negotiated bond transactions.   The procedures further provided that underwriting firms would be assigned to various teams from which they would then be entitled to be selected as underwriters for County bond offerings.

92.    Pursuant to these ordinances the County established various teams of underwriters that formed a pool of County underwriters.   Howard Gary & Co. was designated a member of a pool of underwriters contracted to participate as an underwriter in municipal securities issued by the County and MDX. Only members of the County underwriting pool could serve as underwriters in municipal securities by the County offerings issued by MDX.

93.    On or about May 1998, the County removed or undesignated Howard Gary & Co. from the pool of underwriters contracted to participate as an underwriter in municipal securities issued by the County. This removal prohibited Howard Gary & Co. from being contracted to participate as an underwriter in securities offering by the County, MDX, or any other affiliate agencies.   This removal of Howard Gary & Co. breached an existent contract between Howard Gary & Co. and the County.  (Attached as Exhibit E)

CASE NO. 00-1951-CIV-LENARD/TURNOFF

94.    The County's removal of Howard Gary & Co. from the County underwriters' pool was accomplished by a majority vote and resolution of the Board of County Commissioners in Resolution No. R-543-98 (Attached as Exhibit E) and this constituted state action under color of law.

95.    During 1996, several other non-minority owned securities broker-dealer firms, including Rauscher, Smith Barney, Merrill Lynch, PaineWebber, Prudential, AG Edwards and others were also the subject and target of publicized allegations of misconduct relating to their activities as municipal underwriters.

96.    During 1996 and thereafter, the other non-minority owned securities broker-dealer firms were identified in local and national media as being engaged misconduct relating to their activities as municipal underwriters.

97.    The misconduct of the non-minority owned securities broker-dealer relating to their activities as municipal underwriters firms was well known to the County. Indeed the misconduct of some non-minority owned securities broker-dealers related to their activities as municipal underwriters for the County.

98.    Non-minority owned securities broker-dealer firms were not removed from their duties as underwriters on County underwriting teams based upon accusations of misconduct contained in local media or national business media.

99.    Howard Gary & Co. was denied equal protection of law as enjoyed by non-minority owned securities broker-dealer firms. This denial caused Howard Gary & Co. damages and the County's actions were the proximate cause of Howard Gary & Co.'s damages.

WHEREFORE, Plaintiff seeks compensatory damages and attorneys fees against County.

## COUNT VIII - 42 U.S.C. § 1981 Against County

100.   Plaintiff realleges and incorporates by reference all the allegations contained in paragraph one through twenty five with the same force and effect as if set forth herein.

101.   County Ordinances No. 94-158 and No. 95-37 are attached as Exhibit B & C, respectively.   These ordinances provided procedures for selection of underwriting firms for negotiated bond transactions.   The procedures further provided that underwriting firms would be assigned to various teams from which they would then be entitled to be selected as underwriters for County bond offerings.

102.   Pursuant to these ordinances the County established various teams of underwriters that formed a pool of County underwriters.   Howard Gary & Co. was designated a member of a pool of underwriters contracted to participate as an underwriter in municipal securities issued by the County and MDX. Only members of the County underwriting pool could serve as underwriters in municipal securities by the County offerings issued by MDX.

103.   Pursuant to County resolution, Howard Gary & Co. was designated a member of the County underwriters' pool.   As such, Howard Gary & Co. was contracted to participate as an underwriter in County bond offerings.

104.   On or about May 1998, the County removed or undesignated Howard Gary & Co. from the County underwriting pool contracted to participate as an underwriter in County bond offerings.

105. The County's removal of Howard Gary & Co. from the County underwriters' pool was accomplished by a majority vote and resolution of the Board of County Commissioners.

106. During 1996, several other non-minority owned securities broker-dealer firms, including Rauscher, Smith Barney, Merrill Lynch, PaineWebber, Prudential, AG Edwards and others were also the subject and target of publicized allegations of misconduct relating to their activities as municipal underwriters.

107. During 1996 and thereafter, the other non-minority owned securities broker-dealer firms were identified in local and national media as being engaged misconduct relating to their activities as municipal underwriters.

108. The misconduct of the non-minority owned securities broker-dealer relating to their activities as municipal underwriters firms was well known to the County. Indeed the misconduct of some non-minority owned securities broker-dealers related to their activities as municipal underwriters for the County.

109. Non-minority owned securities broker-dealer firms were not removed from their duties as members of the County underwriters' pool based upon accusations of misconduct contained in local media or national business media.

110. The action of removing Howard Gary & Co., an African-American majority owned company, from the County underwriters' pool, was on the basis of race and denied Howard Gary & Co. the right to make and enforce contracts.

111. Howard Gary & Co., an African-American majority owned company, was denied the full and equal benefit of all laws and proceedings as enjoyed by non-minority

owned securities broker-dealer firms. This denial caused Howard Gary & Co. damages and the County's actions were the proximate cause of Howard Gary & Co.'s damages.

WHEREFORE, Plaintiff seeks compensatory damages and attorneys fees against County.

### COUNT IX - Breach of Contract Against County

112.    Plaintiff realleges and incorporates by reference all the allegations contained in paragraph one through twenty five with the same force and effect as if set forth herein.

113.    County Ordinances No. 94-158 and No. 95-37 are attached as Exhibit B & C, respectively.   These ordinances provided procedures for selection of underwriting firms for negotiated bond transactions.    The procedures further provided that underwriting firms would be assigned to various teams from which they would then be entitled to be selected as underwriters for County bond offerings.

114.    Pursuant to these ordinances the County established various teams of underwriters that formed a pool of County underwriters.   Howard Gary & Co. was designated a member of a pool of underwriters contracted to participate as an underwriter in municipal securities issued by the County and MDX.  Only members of the County underwriting pool could serve as underwriters in municipal securities by the County offerings issued by MDX.

115.    Pursuant to County resolution, Howard Gary & Co. was designated a member of the County underwriters' pool.   As such, Howard Gary & Co. was contracted to participate as an underwriter in County bond offerings.

116.   As a result of its designation as a member of the County underwriters' pool, Howard Gary & Co. had a contract with the County to serve as an underwriter in the sale of the bonds.

117.   Howard Gary & Co. faithfully and fully performed his obligations as member of the County underwriters' pool.

118.   The County unilaterally rescinded its designation of Howard Gary & Co. as a member of the County underwriters' pool, thereby breaching its contract with Howard Gary & Co.

119.   Howard Gary & Co. was damaged by the County's unilateral rescission and breach and caused Howard Gary & Co. damages and the County's actions were the proximate cause of Howard Gary & Co.'s damages.

WHEREFORE, Plaintiff seeks compensatory damages against County.

## COUNT X – 42 U.S.C. § 1983 Against MDX

120.   Plaintiff realleges and incorporates by reference all the allegations contained in paragraph one through twenty five with the same force and effect as if set forth herein.

121.   The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution guarantees to all citizens the full and equal benefit of equal rights under the law irrespective of race.   Violations of the Equal Protection Clause are actionable claims pursuant to 42 U.S.C. § 1983.

122.   County Ordinances No. 94-158 and No. 95-37 are attached as Exhibit B & C, respectively.   These ordinances provided procedures for selection of underwriting firms for negotiated bond transactions.   The procedures further provided that

underwriting firms would be assigned to various teams from which they would then be entitled to be selected as underwriters for County bond offerings.

123.   Pursuant to these ordinances the County established various teams of underwriters that formed a pool of County underwriters.  Howard Gary & Co. was designated a member of a pool of underwriters contracted to participate as an underwriter in municipal securities issued by the County and MDX.  Only members of the County underwriting pool could serve as underwriters in municipal securities by the County offerings issued by MDX.

124.   On or about June 1996, pursuant to MDX procedures in existence during and prior to 1996, Howard Gary & Co. was invited by MDX to participate as a member of an authorized underwriter in the toll system revenue bond offering ("toll revenue bond") to be issued by MDX.

125.   Thereafter, pursuant to MDX procedures in existence during and prior to 1996, Howard Gary & Co. was designated a member and co-senior manager of the MDX toll revenue bond underwriting team by way of MDX Resolution 96-7 (Attached as Exhibit F).  As such, Howard Gary & Co. was contracted to participate as an underwriter in the toll revenue bond offering by MDX.

126.   MDX unilaterally rescinded its designation of Howard Gary & Co. as a member of the toll revenue bond underwriting team, thereby breaching its contract with Howard Gary & Co and this constituted state action under color of law.

127.   MDX's removal of Howard Gary & Co. from the County toll revenue bond pool was accomplished by a majority vote and resolution of the MDX board by resolution and this constituted state action under color of law.

128.   During 1996, several other non-minority owned securities broker-dealer firms, including Rauscher, Smith Barney, Merrill Lynch, PaineWebber, Prudential, AG Edwards and others were also the subject and target of publicized allegations of misconduct relating to their activities as municipal underwriters.

129.   During 1996 and thereafter, the other non-minority owned securities broker-dealer firms were identified in local and national media as being engaged misconduct relating to their activities as municipal underwriters.

130.   The misconduct of the non-minority owned securities broker-dealer relating to their activities as municipal underwriters firms was well known to MDX. Indeed the misconduct of some non-minority owned securities broker-dealers related to their activities as municipal underwriters for the County.

131.   Non-minority owned securities broker-dealer firms were not removed from their duties as underwriters on MDX underwriting teams based upon accusations of misconduct contained in local media or national business media.

132.   By Howard Gary & Co. was denied equal protection of law as enjoyed by non-minority owned securities broker-dealer firms. This denial caused Howard Gary & Co. damages and the MDX's actions were the proximate cause of Howard Gary & Co.'s damages.

WHEREFORE, Plaintiff seeks compensatory damages and attorneys fees against County.

CASE NO. 00-1951-CIV-LENARD/TURNOFF

## COUNT XI - 42 U.S.C. § 1981 Against MDX

133.   Plaintiff realleges and incorporates by reference all the allegations contained in paragraph one through twenty five with the same force and effect as if set forth herein.

134.   County Ordinances No. 94-158 and No. 95-37 are attached as Exhibit B & C, respectively.   These ordinances provided procedures for selection of underwriting firms for negotiated bond transactions.   The procedures further provided that underwriting firms would be assigned to various teams from which they would then be entitled to be selected as underwriters for County bond offerings.

135.   Pursuant to these ordinances the County established various teams of underwriters that formed a pool of County underwriters.   Howard Gary & Co. was designated a member of a pool of underwriters contracted to participate as an underwriter in municipal securities issued by the County and MDX.   Only members of the County underwriting pool could serve as underwriters in municipal securities by the County offerings issued by MDX.

136.   On or about June 1996, pursuant to MDX procedures in existence during and prior to 1996, Howard Gary & Co. was invited by MDX to participate as a member of an authorized underwriter in the toll system revenue bond offering ("toll revenue bond") to be issued by MDX.

137.   Thereafter, pursuant to MDX procedures in existence during and prior to 1996, Howard Gary & Co. was designated a member and co-senior manager of the MDX toll revenue bond underwriting team by way of MDX Resolution 96-7 (Attached as

Exhibit F).  As such, Howard Gary & Co. was contracted to participate as an underwriter in the toll revenue bond offering by MDX.

138.   MDX unilaterally rescinded its designation of Howard Gary & Co. as a member of the toll revenue bond underwriting team, thereby breaching its contract with Howard Gary & Co.

139.   MDX's  removal of Howard Gary & Co. from the underwriting team in the Water and Sewer bond offering was accomplished by a majority vote and resolution of the MDX board.

140.   During 1996, several other non-minority owned securities broker-dealer firms, including Rauscher, Smith Barney, Merrill Lynch, PaineWebber, Prudential, AG Edwards and others were also the subject and target of publicized allegations of misconduct relating to their activities as municipal underwriters.

141.   During 1996 and thereafter, the other non-minority owned securities broker-dealer firms were identified in local and national media as being engaged misconduct relating to their activities as municipal underwriters.

142.   The misconduct of the non-minority owned securities broker-dealer relating to their activities as municipal underwriters firms was well known to MDX. Indeed the misconduct of some non-minority owned securities broker-dealers related to their activities as municipal underwriters for the County.

143.   Non-minority owned securities broker-dealer firms were not removed from their duties as underwriters on MDX underwriting teams based upon accusations of misconduct contained in local media or national business media.

144.   The action of removing Howard Gary & Co., an African-American majority owned company, from the underwriting team in the toll revenue bond, was on the basis of race and denied Howard Gary & Co. the right to make and enforce contracts in the same manner afforded to non-minority firms.

145.   Howard Gary & Co., an African-American majority owned company, was denied the full and equal benefit of all laws and proceedings as enjoyed by non-minority owned securities broker-dealer firms. This denial caused Howard Gary & Co. damages and MDX's actions were the proximate cause of Howard Gary & Co.'s damages.

WHEREFORE, Plaintiff seeks compensatory damages and attorneys fees against MDX.

### COUNT XII- Breach of Contract Against MDX

146.   Plaintiff realleges and incorporates by reference all the allegations contained in paragraph one through twenty five with the same force and effect as if set forth herein.

147.   County Ordinances No. 94-158 and No. 95-37 are attached as Exhibit A & B, respectively.   These ordinances provided procedures for selection of underwriting firms for negotiated bond transactions.   The procedures further provided that underwriting firms would be assigned to various teams from which they would then be entitled to be selected as underwriters for County bond offerings.

148.   Pursuant to these ordinances the County established various teams of underwriters that formed a pool of County underwriters.   Howard Gary & Co. was designated a member of a pool of underwriters contracted to participate as an underwriter in municipal securities issued by the County and MDX.   Only members of

the County underwriting pool could serve as underwriters in municipal securities by the County offerings issued by MDX.

149.    On or about June 1996, pursuant to MDX procedures in existence during and prior to 1996, Howard Gary & Co. was invited by MDX to participate as a member of an authorized underwriter in the toll system revenue bond offering ("toll revenue bond") to be issued by MDX.

150.    Thereafter, pursuant to MDX procedures in existence during and prior to 1996, Howard Gary & Co. was designated a member and co-senior manager of the MDX toll revenue bond underwriting team by way of MDX Resolution 96-7 (Attached as Exhibit F).  As such, Howard Gary & Co. was contracted to participate as an underwriter in the toll revenue bond offering by MDX.

151.    As a result of its designation as a member of the MDX toll revenue bond underwriting team, Howard Gary & Co. had a contract with MDX to serve as an underwriter in the sale of the MDX toll revenue bonds.

152.    Howard Gary & Co. began to perform its obligations as member of the MDX toll revenue bond underwriting team.

153.    MDX unilaterally rescinded its designation of Howard Gary & Co. as a member of the MDX toll revenue bond underwriting team, thereby breaching its contract with Howard Gary & Co.

154.    Howard Gary & Co. was damaged by MDX's unilateral rescission and breach and caused Howard Gary & Co. damages and MDX's actions were the proximate cause of Howard Gary & Co.'s damages.

WHEREFORE, Plaintiff seeks compensatory damages against County.

## COUNT XIII- Tortious Interference with Business Relationships Against Rauscher

155.    Plaintiff realleges and incorporates by reference all the allegations contained in paragraph one through twenty five with the same force and effect as if set forth herein.

156.    Pursuant to County code provisions in existence during and prior to 1996, Howard Gary & Co. was designated a member of a pool of underwriters contracted to participate as an underwriter in municipal securities issued by the County and MDX. Only members of the County underwriting pool could serve as underwriters in municipal securities offerings issued by MDX.

157.    Pursuant to County provisions in existence during and prior to 1996, Howard Gary & Co. was also designated a member of an authorized underwriting team in the issuance of municipal securities involving the Seaport ("Seaport bond"). As such, Howard Gary & Co. was contracted to participate as an underwriter in Seaport bond.

158.    Pursuant to County provisions in existence during and prior to 1996, Howard Gary & Co. was also designated a member of an authorized underwriting team in the issuance of municipal securities involving the Water and Sewer Department ("Water and Sewer bond"). As such, Howard Gary & Co. was contracted to participate as an underwriter in Water and Sewer bond.

159.    On or about June 1996, pursuant to MDX procedures in existence during and prior to 1996, Howard Gary & Co. was invited by MDX to participate as a member of an authorized underwriter in the toll system revenue bond offering ("toll revenue bond") to be issued by MDX.

160.   Thereafter, pursuant to MDX procedures in existence during and prior to 1996, Howard Gary & Co. was designated a member and co-senior manager of the MDX toll revenue bond underwriting team.   As such, Howard Gary & Co. was contracted to participate as an underwriter in the toll revenue bond offering by MDX.

161.   The existence of Howard Gary & Co. as a member of the County underwriting team for the Seaport and Water and Sewer bonds evinced a beneficial business relationship between the County and Howard Gary & Co.

162.   The existence of Howard Gary & Co. as a member of the County underwriter's pool evinced a beneficial business relationship between the County and Howard Gary & Co.

163.   The existence of Howard Gary & Co. as a member of the MDX underwriting team for the MDX toll revenue bond offering evinced a beneficial business relationship between MDX and Howard Gary & Co.

164.   The removal of Howard Gary & Co. from the County Seaport, Water and Sewer, MDX toll revenue bond offering, and the County underwriter's pool was motivated in large part by the actions of Rauscher.

165.   As financial advisor to the County and MDX, Rauscher was aware that Howard Gary & Co. had beneficial business relationships between Howard Gary & Co. and the County and MDX.   These beneficial relationships permitted and obligated Howard Gary & Co. to participate as an underwriter in various bond offerings.

166.   As financial advisor to the County and MDX, Rauscher was aware of these existent beneficial business relationships between Howard Gary & Co. and the County and MDX were financially beneficial to Howard Gary & Co.

167.    Nevertheless, beginning on or about September 1996, in their capacity as financial advisor to the County and MDX, Rauscher intentionally and unjustifiably interfered with Howard Gary & Co.'s beneficial business relationships with the County and MDX.   Rauscher urged and recommended that the County and MDX remove Howard Gary & Co. from its participation as an underwriter in the bond offerings.

168.    Rauscher was aware of the federal government's formal written confirmation that Howard Gary & Co. was not a target or subject of a criminal investigation, and that the County's successful Solid Waste bond offering was facilitated with Howard Gary & Co. as member of the underwriting team.

169.    Additionally, during this same time period, Rauscher was in attendance at meetings held where other County financial advisors, County finance officers and counsel were present and upon considered discussion concluded that Howard Gary and Co.'s designation as a member of an underwriting team in the offering of County securities would not have a negative effect on the price or marketability of the securities.

170.    During 1996, several other securities broker-dealer firms, including Rauscher, Smith Barney, Merrill Lynch, PaineWebber, Prudential, AG Edwards and others were also the subject and target of publicized allegations of misconduct relating to their activities as municipal underwriters.

171.    During 1996 and thereafter, the other securities broker-dealer firms were identified in local and national media as being engaged in misconduct relating to their activities as municipal underwriters.

172.    The misconduct of the other securities broker-dealers relating to their activities as municipal underwriters firms was well known to the Rauscher.   Indeed the

misconduct of some non-minority owned securities broker-dealers related to their activities as municipal underwriters for the County.

173.  However, Rauscher did not urge and recommend that the County and MDX remove the other broker-dealers from their participation as underwriters in County or MDX bond offerings.

174.  In spite of the same, Rauscher persisted in its intentional and unjustifiable interference with Howard Gary & Co.'s beneficial business relationships with the County and MDX.

175.  Rauscher's intentional and unjustifiable interference with Howard Gary & Co.'s beneficial business relationships with the County and MDX was motivated by Howard Gary & Co.'s previous opinions and comments concerning Rauscher to the City of Miami as the latter's financial advisor in from 1994 through 1996.

176.  In 1995, Rauscher served as an underwriter for City of Miami municipal securities offering.  At that time, and going into the summer of 1996, Howard Gary & Co. properly and justifiably advised the City of Miami that the City of Miami's contemplated revenue bond offering was improper or illegal deficit financing and that the same would have a deleterious effect on the City's financial condition.

177.  This opinion by Howard Gary and Co. was directly critical of Rauscher's underwriting services to the City of Miami as regarded the City of Miami's contemplated 1995 municipal bond offering.

178.  Howard Gary & Co. was damaged by the Rauscher's actions and Rauscher's actions were the proximate cause of Howard Gary & Co.'s damages.

WHEREFORE, Plaintiff seeks compensatory damages against Rauscher.

**COUNT XIV– Breach of Contract Against Grigsby Inc., GBR and Rice Financial**

179. Plaintiff realleges and incorporates by reference all the allegations contained in paragraph one through twenty five with the same force and effect as if set forth herein.

180. Pursuant to County code provisions in existence during and prior to 1996, Grigsby Inc. was designated a member of a pool of underwriters contracted to participate as an underwriter in municipal securities issued by the County and MDX. Only members of the County underwriting pool could serve as underwriters in municipal securities offerings issued by MDX.

181. Pursuant to County code provisions in existence during and prior to 1996, on or about July 1996, Grigsby Inc. and Howard Gary & Co. were designated as members of an authorized underwriting team in the issuance of a Dade County, Florida Resource Recovery Facility Refunding Bond, Series 1996. This offering also contemplated an accompanying interest rate swap transaction. ("Montenay bond") As such, Grigsby Inc. and Howard Gary & Co. were contracted to participate as underwriters in Montenay bond. This offering also contemplated an accompanying interest rate swap transaction.

182. The County designated Grigsby Inc. as a member and senior manager of the underwriting team for the Montenay bond.

183. Various other underwriters were also designated as members of the underwriting team for the Montenay bond, including but not limited to Smith Barney, Inc. and AIBC Investments.

184.   As senior manager, Grigsby Inc. assigned GBR and Rice Financial to assist in the underwriting and accompanying interest rate swap transaction in the Montenay bond.

185.   As senior manager, Grigsby Inc., GBR and Rice Financial were assigned the role of collecting fees for the underwriting team members generated from the sale of the municipal securities and the accompanying interest rate swap transaction in the Montenay bond.

186.   Howard Gary & Co. was to receive an underwriter's fee and half of the fees, after expenses, generated from the interest rate swap as compensation for its participation in the Montenay bond. (See letter of James Burke dated August 5, 1996 attached as Exhibit F)

187.   The closing on the successful and completed sale of the municipal securities and the accompanying interest rate swap transaction in the in the Montenay bond occurred on or about September 1996.

188.   The responsibilities and obligations created as a result of Grigsby, Inc. GBR, Rice Financial and Howard Gary & Co. being assigned to the underwriting team for the Montenay bond established a contract between the parties.

189.   Howard Gary & Co. faithfully complied with and satisfied its obligations in discharge of its contractual obligations to Grigsby Inc., GBR and Rice Financial regarding its role as an underwriter in the offering of municipal securities and accompanying interest rate swap transaction in the Montenay bond.

190.   In its their role as senior manager and entities designated by the senior manager to assist the same, Grigsby Inc., GBR, and Rice Financial were obligated to

make a timely post closing accounting of the entire Montenay bond transaction and the accompanying interest rate swap transaction. The same were also required to disburse underwriters' fees and swap transaction fees to the various members of the underwriters' team, including Howard Gary & Co.

191.   In the months after the closing on the Montenay bond offering, Grigsby Inc., GBR, and Rice Financial collected underwriters' fees and swap transaction fees and provided a post closing accounting to various members of the underwriting team. Grigsby Inc., GBR, and Rice Financial also began to disburse underwriters' fees totaling in excess of hundreds of thousands of dollars to various members of the Montenay underwriting team, including but not limited to Smith Barney, Inc. and AIBC Investments.

192.   As Howard Gary & Co. faithfully complied with and satisfied its obligations as member of the Montenay bond underwriting team in discharge of its contractual obligations to Grigsby, Inc., GBR, and Rice Financial, Howard Gary & Co. was due to collect money as underwriters' fees from the sale of the municipal securities and money in swap fees from the accompanying interest rate swap transaction from funds collected by Grigsby Inc., GBR, and Rice Financial.

193.   No accounting or disbursement of fees generated from the sale of the municipal securities and the accompanying interest rate swap transaction was provided by Grigsby, Inc., GBR, or Rice Financial to Howard Gary & Co.

194.   Howard Gary & Co. repeated requested of Grigsby Inc. and its then principals, Calvin Grigsby, Napoleon Brandford, and Suzanne Shank, that an accounting and disbursement occur however no accounting or disbursement occurred.

CASE NO. 00-1951-CIV-LENARD/TURNOFF

195.   As a result, Grigsby Inc., GBR, and Rice Financial retained well over a million dollars due to Howard Gary & Co. for its role as a member of the underwriters' team in the Montenay bond in breach of their contractual obligations to Howard Gary & Co.

196.   Howard Gary & Co. was damaged by Grigsby, Inc., GBR, and Rice Financial's unilateral rescission and breach and their actions were the proximate cause of Howard Gary & Co.'s damages.

197.   As Rice is the alter ego, one to the others, of GBR and Rice Financial, he is individually liable for the breach of contract of his alter egos, GBR and Rice Financial.

198.   As Grigsby is the alter ego, one to the other, of Grigsby Inc. then he is individually liable for the breach of contract of his alter ego, Grigsby Inc.

WHEREFORE, Plaintiff seeks compensatory damages against Grigsby, Grigsby Inc., GBR, Rice Financial and Rice.

Respectfully submitted,

RONALD J. COHEN, P.A.
8100 Oak Lane, Suite 403
Miami Lakes, Florida 33016
Telephone:   305.823.1212
Facsimile:     305.823.7778

By _____
          Ronald J. Cohen
          Florida Bar No. 235504

By _____
          Jose J. Arrojo
          Florida Bar No. 744808

38

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via U.S. Mail the 21st day of October, 2002 to **Jeffrey P. Ehrlich, Esq.,** Miami-Dade County Attorney's Office, 111 N.W. 1st Street, Suite 2810, Miami, Florida 33128; **Holly R. Skolnick, Esq.**, Greenberg Traurig, P.A., 1221 Brickell Avenue, Miami, Florida 33131; **Richard J. Burton, Esq.**, Richard J. Burton & Associates, P.A., 18305 Biscayne Boulevard, Suite 300, North Miami Beach, Florida 33160; **Richard S. Davis, Esq.,** Foley & Lardner, Suite 200 - East Tower, 777 South Flagler Drive, West Palm Beach, Florida 33401; **Joseph D. Edmundson, Jr. Esq.,** Foley & Lardner, Washington Harbour, Suite 500, 3000 K. Street, N.W., Washington, D.C. 20007; **Gregory N. Woods, Esq.,** Porter, Wright, Morris & Arthur, LLP, 5801 Pelican Bay Boulevard, Suite 300, Naples, Florida 34108; **David L. Douglas, Esq., Theresa W. Hajost, Esq., Jennifer J. Illingsworth, Esq.,** Porter, Wright, Morris & Arthur, LLP, 1919 Pennsylvania Avenue, N.W., Suite 500, Washington, D.C. 20006; **Christopher R. Mank, Esq.**, Mintzer, Sarowitz, Zeris, Ledva & Meyers, LLP, 2600 S. Douglas Road, Suite 1102, Coral Gables, Florida 33134; **James Nespole,  Esq., Eduardo Dolido, Esq.** Fulbright & Jaworski, 666 Fifth Avenue, New York, NY 10103; **Edward M. Mullins, Esq., Edward H. Davis, Esq., Lawrence Gordon, Esq.**, Astigarraga Davis Mullins & Grossman, P.A., Miami Center, 20th Floor, 201 Biscayne Boulevard, Miami, Florida 33131; **Richard M. Leslie, Esq., Maxine M. Long, Esq.,** Shutts & Bowen, 1500 Miami Center, 201 South Biscayne Boulevard, Miami, Florida 33131; **Dawn R. Georgiades, Esq.,** Greenberg Traurig, P.A.,

1221 Brickell Avenue, Miami, Florida 33131; **Michael S. Press, Esq.**, Warner & Scheuerman, 6 West 18 Street, 10th Floor, New York, NY 10011 and **James C. Burke, pro se**, 1860 N.E. 142nd Street, Penthouse I, North Miami, Florida 33138.

By: _____
     Jose J. Arrojo



(

**U.S. Department of Justice**

*United States Attorney*
*Southern District of Florida*

---

99 N.E. 4 Street, Suite 800
Miami, Florida 33132-2111

October 30, 1996

Mr. Peter Raben, P.A.
1870 South Bayshore Dr.
Coconut Grove, FL 33133

         Re: <u>Howard Gary & Co.</u>

Dear Mr. Raben:

    This letter is written to respond to your written request, as counsel for Howard Gary & Co., for clarification of the status of the entity, Howard Gary & Co., in a grand jury investigation in this District. This letter confirms that the firm, Howard Gary & Co., is not now a subject or a target of the grand jury's investigation into political corruption in Miami or Metro-Dade County known as Operation Greenpalm.

               SINCERELY,

               WILLIAM A. KEEFER
               UNITED STATES ATTORNEY

               By: *Mary Butler*
               Mary K. Butler
               Assistant United States Attorney

**PLAINTIFF'S EXHIBIT**

A

Amended
Substitute
Agenda Item No. 7 (F)
9-13-94

ORDINANCE NO.    94-158

ORDINANCE RESCINDING ORDINANCE NO. 93-67 IN ITS
ENTIRETY; RESTATING PROVISIONS OF ORDINANCE NO.
93-67 PERTAINING TO SALE OF COUNTY BONDS BY
COMPETITIVE BID; PROVIDING PROCEDURE FOR
SELECTION OF UNDERWRITING FIRMS FOR
NEGOTIATED BOND TRANSACTIONS; PROHIBITING
LOBBYING IN CERTAIN SITUATIONS; EXCLUDING DADE
COUNTY'S PERIPHERAL BOND ISSUING AUTHORITIES
FROM ORDINANCE; PROVIDING SEVERABILITY,
INCLUSION IN THE CODE, AND AN EFFECTIVE DATE

**WHEREAS,** Ordinance No. 93-67 was enacted on July 13, 1993 which provided for the
issuance of all County bonds by competitive bid, along with other related matters;

**WHEREAS,** since certain provisions of such Ordinance No. 93-67 are no longer
applicable and others will be amended or restated by this Ordinance, the Board wishes to rescind
such Ordinance No. 93-67 in its entirety;

**WHEREAS,** the provisions related to the sale of all County bonds by competitive bid and
the procedure for the waiver of such competitive bid set forth in Ordinance No. 93-67 shall be
restated verbatim;

**WHEREAS,** the Board wishes to amend the procedures for the selection of underwriting
firms if the sale of bonds is negotiated which includes additional opportunities for participation by
minority owned and local underwriting firms;

**BE IT ORDAINED BY THE BOARD OF COUNTY COMMISSIONERS OF
DADE COUNTY, FLORIDA:**

C ORD 229 SAM



PLAINTIFF'S
EXHIBIT
B

Section 1.    Ordinance No. 93-67 is repealed in its entirety.

Section 2.    As stated verbatim in Ordinance No. 93-67, all general obligation and revenue bonds sold by the County shall be sold at public sale by competitive bids at such place or places as the County shall determine for the purchase of such bonds.

Section 3.    The provisions of this Ordinance may be waived in the same manner as provisions would have been waived pursuant to Ordinance No. 93-67, that is:

A.-    upon both the written recommendation of the County Manager and the financial advisor, by a majority of the entire membership of the Board of County Commissioners upon the finding that a waiver is in the best interests of the County, provided the written recommendation of the County Manager sets forth specific findings as to the reasons a negotiated sale is recommended; or

B.    by an affirmative vote of two-thirds (2/3) of the entire membership of the Board of County Commissioners, provided the Board makes specific findings as to the reasons a negotiated sale is in the County's best interests.

Section 4.    Whenever the competitive bid process has been waived pursuant to the provisions of Section 3 above, the bonds being proposed may be sold on a negotiated basis to the underwriting team selected in the manner described in Section 5, below.

Section 5.

A.    For a three-year period, or until an underwriting team described below has underwritten in the aggregate $2 Billion in bonds (such $2 Billion limitation achieved by one underwriting team shall not affect any other underwriting team), whichever occurs first from the date the underwriting teams are selected by the Board of County Commissioners, three

Amended
Substitute
Agenda Item No. 7 (F)
Page 3

underwriting teams consisting of a "Senior Manager" and two "Co-Senior Managers" shall be selected in the manner described in this Section to manage all negotiated bond sales, except those bond issues described in Section 6 of this Ordinance.

   B.    Each underwriting team shall include an additional five to eleven underwriting firms which shall act as Co-Managers.  The following table sets forth the number and bond allocation for each bond issue:

| | FOR BOND ISSUES | | | |
|---|---|---|---|---|
| | UP TO BUT NOT INCLUDING $200 MILLION | $200M UP TO BUT NOT INCLUDING $300 MILLION | $300M UP TO BUT NOT INCLUDING $400 MILLION | OVER $400 MILLION |
| One Senior Manager (Book Runner)- | 40% | 34% | 30% | 27% |
| Two Co-Senior Managers @ | 17.5% | 15.5% | 13.85% | 11.75% |
| Five Co-Managers @ | 5% | | | |
| Seven Co-Managers @ | | 5% | | |
| Nine Co-Managers @ | | | 4.7% | |
| Eleven Co-Managers @ | | | | 4 5% |

   C.    The underwriting firms selected to serve as "Senior Manager," and "Co-Senior Managers" for each team shall rotate positions for each bond transaction as determined by the Manager's Finance Committee ("MFC") established under subsection G below.   When determining the rotation for each matter assigned to an underwriting team, the MFC shall consider workload, capital strength and adequacy, past compensation and performance, and other like factors such as prior experience in evaluating a firm's ability to serve as Senior Manager.

   D.    All underwriting firms licensed to trade in municipal securities are eligible to serve as a "Senior Manager" or "Co-Senior Manager" and shall be selected for each of these positions through a competitive Request for Qualifications (RFQ) process.  Prior to its issuance, the terms and criteria of the RFQ shall be reviewed and approved by the Board of County Commissioners. Such terms and criteria shall include a requirement that no underwriting firm shall be a Senior

Manager or Co-Senior Manager on any underwriting team, if such firm is serving as financial advisor to the County, including the Aviation Department. The RFQ shall provide that one firm for each underwriting team shall be selected from qualified and responsive underwriting firms which (i) are regional firms which maintain their primary corporate headquarters in the State of Florida or (ii) maintain their primary corporate headquarters in Dade County or (iii) is a minority firm which means that fifty-one percent (51%) or more of the firm is owned and controlled by blacks, females, or Hispanics, or any combination of each.

     E.     Once the underwriting teams are selected, the MFC shall assign an underwriting team to each negotiated bond matter. When making assignments, the MFC shall use its best efforts to equalize compensation among the three underwriting teams by the end of the three-year period.

     F.     The firms to serve as the "Co-Managers" shall be selected by the MFC, at the start of a bond transaction, through a rotation from the County's certified lists of black, Hispanic and female owned, disadvantaged and local underwriting firms maintained by the Department of Business and Economic Development (DBED) (the "Certified Lists"). The MFC shall consider workload and past compensation in determining the rotation. The number of firms rotated onto a transaction shall be reduced as necessary if an insufficient number of firms are on the certification lists maintained by DBED.

     G.     The MFC is hereby established and shall be comprised of representatives of the County Manager's Office, the County Attorney's Office, the appropriate departments, the Finance Director's Office, and the appropriate financial advisor to evaluate responses to the RFQ contemplated in Section 4.D above and Section 6.C below. The MFC shall rank the responses based solely on the written submittals and other criteria specified in the RFQ and shall submit two lists to the County Manager. One list will rank all responsive firms to the RFQ and the other list will rank all responsive minority, regional and local firms to the RFQ. An underwriting firm may

not serve as Senior Manager or Co-Senior Manager for more than one underwriting team described in subparagraph A. of this Section 5.

The County Manager shall recommend two firms on the MFC's list of all responsive firms and recommend one firm on the MFC's list of all responsive minority, regional and local firms for each of the three underwriting teams. His recommendation shall be submitted to the Finance, Budget & Empowerment Zone Committee and the Board of County Commissioners. The Finance, Budget & Empowerment Zone Committee may also make a recommendation to the County Commission following its review of the Manager's recommendation. After receiving the Manager's and the Finance, Budget & Empowerment Zone Committee's recommendations, this Board shall select three firms for each of the three underwriting teams.

H. Any bonds sold to an underwriting team must be accomplished pursuant to an award resolution of this Board.

I. After the completion of each bond transaction, the underwriting team involved in the sale shall be subject to a post sale review by the Finance Director and the County's financial advisor assigned to the matter. The County reserves the right to replace an underwriting firm at any time if such reviews are unsatisfactory.

J. If a vacancy occurs for any reason on any of the underwriting teams, a new underwriting firm may be selected by the County Manager from the firms remaining on the list submitted by the MFC. Alternatively, a new underwriting firm may be selected in accordance with the RFQ provisions of this Ordinance. The County Manager's recommendation shall be reviewed by the Finance, Budget & Empowerment Committee and approved by this Board.

Section 6.

A. The County shall establish an underwriting team, composed of underwriting firms from the County's Certified Lists of underwriting firms (the "Certified Team"), to serve on certain bond transactions with an aggregate principal amount of $50 million or less.

C ORD:29 SAM

Case 1:06-cv-01954-JAL    Document 100    Entered on FLSD Docket 08/21/2008    Page 47 of 98

B.    To be eligible for the Certified Team, a firm must be on one of the Certified Lists, or in the process of being certified for one of the Certified Lists, by the County.  The Certified Team shall consist of a Senior Manager, two Co-Senior Managers and two Co-Managers, and shall serve for a period of three years.

C.    The Senior Manager and two Co-Senior Managers shall be selected through a competitive RFQ process.  The RFQ shall be reviewed and approved by the Board.  The MFC shall rank the responses solely on the written submittals and other criteria specified in the RFQ, and shall submit a list ranking the responsive firms for these positions to the County Manager. The County Manager shall make a recommendation to the Finance, Budget & Empowerment Committee and this Board.  The Finance, Budget & Empowerment Committee may also make a recommendation to the Board.  Following a review of the Manager's and the Finance, Budget & Empowerment Committee's recommendations, the Board shall select three firms to serve as Senior Manager and Co-Senior Managers on a rotating basis.  Selection to the Certified Team does not preclude a firm from being selected for any other underwriting team established pursuant to this Ordinance.

D.    The two Co-Managers shall be selected in the manner set forth in Section 5.F of this Ordinance.

E.    The particular bond transaction selected for the Certified Team shall be determined by the MFC in its sole discretion subject to review by the Finance, Budget & Empowerment Committee and approval by the Board.  The recommendation by the MFC shall be modified by the Board only upon a two-thirds (2/3) vote of the entire membership of the Board in favor of the modification, provided the Board makes specific findings as to its reasons for altering the MFC's recommendation.

F.    Subparagraphs H, I and J of Section 5 of this Ordinance also apply to the Certified Team and each of its members.

C:\ORD\1770 S.AU

Amended
Substitute
Agenda Item No. 7 (F)
Page 7

Section 7.    It is contemplated that members of the underwriting teams, in order to increase the likelihood for a negotiated transaction, would continually monitor the County's activity and develop unsolicited proposals.   In the event an unsolicited proposal leads to a negotiated bond sale, the MFC shall assign the transaction to the underwriting team which has as a member the firm that submitted the unsolicited proposal.

If an underwriting firm which is not a member of an underwriting team submits an unsolicited proposal and the MFC deems that the unsolicited proposal has merit, the underwriting firm which submitted the meritorious proposal shall receive an appropriate, one-time credit in the next evaluation of responses to a RFQ issued by the County.   The MFC shall determine the appropriate credit the underwriter should receive at the time when it determines that the County should proceed with the transaction.  The decision of the MFC shall be final.

Section 8.    The County Manager shall notify the Board in writing of the mailing and dissemination of the RFQ related to the selection of underwriting teams.  After the RFQ has been mailed and disseminated to prospective proposers, no proposer shall in any way intentionally contact or communicate with, directly or indirectly, any elected official of the County, any member of its Staff, or any member of the County administration, including, but not limited to, any person in the County Attorney's Office, any person in the County Manager's Office, any person in the Finance Director's Office, any person in the affected County Department or the County's financial advisor with regard to the subject proposal or matter.  This prohibition related to communications shall not be applicable to (a) communications conducted through the chairperson at a duly advertised public meeting; (b) written requests for information or clarification from prospective proposers related to the RFQ; and (c) communications initiated by the County administration (i.e., members of the County Manager's Office, the Finance Department, the affected operating department, and the County Attorney's Office) or the County's financial advisor related to a written request for information or clarification from a prospective

Amended
Substitute
Agenda Item No. 7 (F)
Page 8

proposer or related to the RFQ. A violation of this provision may result in a disqualification of the proposer for consideration under the terms of this Ordinance.

Section 9. The provisions of this Ordinance do not apply to the issuance of revenue bonds by the following Dade County peripheral bond issuing authorities:

The Dade County Educational Facilities Authority;

The Dade County Health Facilities Authority;

The Housing Finance Authority of Dade County, Florida;

The Dade County Industrial Development Authority.

Section 10. If any section, subsection, sentence, clause or provision of this ordinance is held invalid, the remainder of this ordinance shall not be affected by such invalidity.

Section 11. It is the intention of the Board of County Commissioners, and it is hereby ordained that the provisions of this ordinance shall become and be made a part of the Code of Metropolitan Dade County, Florida. The sections of this ordinance may be renumbered or relettered to accomplish such intention, and the word "ordinance" may be changed to "section," "article," or other appropriate word.

Section 12. The provisions of this ordinance with respect to the establishment of underwriting teams shall not apply to the two proposed aviation bond financings for which responses to the County's Request for Proposals for underwriters have already been received by the Finance Department.

C ORD 229 SAM

Amended
Substitute
Agenda Item No. 7 (F)
Page 9

Section 13.   This ordinance shall become effective ten (10) days after the date of enactment

PASSED AND ADOPTED:   SEP 1 3 1994

Approved by County Attorney as
to form and legal sufficiency.

Prepared by:

Alternate No. 2
Agenda Item No. 7(D)
2-21-95

ORDINANCE NO. **95-37**

ORDINANCE AMENDING ORDINANCE No. 94-158 WITH RESPECT TO CO-SENIOR MANAGER POSITIONS ON THREE NON-CERTIFIED UNDERWRITING TEAMS, PROVIDING SEVERABILITY, INCLUSION IN CODE, AND EFFECTIVE DATE

WHEREAS, Ordinance No. 94-158 was enacted on September 13, 1994 which, among other things, established three non-certified underwriting teams and a certified underwriting team for negotiated County bond transaction; and

WHEREAS, this Board desires to amend Ordinance No. 94-158 by creating two additional Co-Manager positions for the three non-certified underwriting teams; identifying the underwriting firms which shall be eligible for these positions, amending the bond allocation, and providing for an extension of the three year appointment term.

BE IT ORDAINED BY THE BOARD OF COUNTY COMMISSIONERS OF DADE COUNTY, FLORIDA:

Section 1. Subparagraph A. of Section 5. of Ordinance No. 94-158 is hereby amended by deleting the phrase "two Co-Senior Managers" and inserting the phrase "four Co-Senior Managers" in its place.

Section 2. Subparagraph B. of Section 5. of Ordinance No. 94-158 is deleted in its entirety and the following is inserted in its place:

B.    In addition to a Senior Manager and four Co-Senior Managers, each non-certified underwriting team shall also include an additional five to eleven underwriting firms which shall act as Co-Managers and shall be selected in accordance with Subparagraph F. of Section 5. The bonds shall be allocated



PLAINTIFF'S
EXHIBIT
C

among the members of each non-certified team as follows:

| | FOR BOND ISSUES | | | |
|---|---|---|---|---|
| | UP TO BUT NOT INCLUDING $200 MILLION | $200 MILLION UP TO BUT NOT INCLUDING $300 MILLION | $300 MILLION UP TO BUT NOT INCLUDING $400 MILLION | OVER $400 MILLION |
| ONE SENIOR MANAGER (BOOK RUNNER) | 39% | 38% | 36% | 32% |
| THREE CO-SENIOR MANAGERS @ | 12% | 9% | | |
| FOUR CO-SENIOR MANAGERS @ | | | 7% | 6% |
| FIVE CO-MANAGERS @ | 5% | | | |
| SEVEN CO-MANAGERS @ | | 5% | | |
| NINE CO-MANAGERS @ | | | 4% | |
| ELEVEN CO-MANAGERS @ | | | | 4% |

Section 4.   The last sentence of Subparagraph D. Section 5. of Ordinance No. 94-158 is deleted in its entirety and the following sentences are inserted in its place:

The RFQ shall provide that two of the Co-Senior Manager positions for each underwriting team shall be comprised of either locally headquartered minority underwriting firms, Florida based regional underwriting firms, locally headquartered non-minority underwriting firms or minority underwriting firms. A firm qualifies as a Florida regional firm for purposes of this Ordinance if it maintains its primary corporate headquarters in the State of Florida ("Regional"). A firm qualifies as a locally headquartered firm for purposes of this Ordinance if such firm's corporate headquarters are located in Dade County ("Locally Headquartered"). A firm qualifies as a minority firm for the

129799

Alternate No. 2
Agenda Item No. 7(D)
Page No. 3

purposes of this Ordinance if fifty-one percent (51%) or more of the firm is owned and controlled by blacks, females, Hispanics, or any combination of each. ("Minority").   In addition to a Senior Manager and two Co-Senior Managers to be selected from all responsive firms for each of the underwriting teams, one Co-Senior Manager on each of the three underwriting teams shall be selected from qualified and responsive Locally Headquartered Minority firms and the remaining Co-Senior Manager on each underwriting team shall be selected as follows:  Underwriting team  1 - Minority firm or Regional firm; Underwriting team 2 - Regional firm; Underwriting team 3 - Minority firm or Locally Headquartered non-Minority firm.

Transactions with a principal amount up to and including $150 Million shall be assigned to a Senior Manager and three of the four Co-Senior Managers provided, however, that one of the firms shall be a Locally Headquartered Minority firm and one of the firms shall be either a Regional firm, Minority firm or Locally Headquartered non-Minority firm.

Transactions with a principal amount over $150 Million and up to and including $300 Million shall be assigned to a Senior Manager, and three of the four Co-Senior Managers provided, however, that three of the firms shall be firms selected from all responsive firms and one firm shall be a Locally Headquartered Minority firm. The  firm not assigned to the transaction which shall be a Regional firm, Minority firm or Locally Headquartered non-Minority

firm, shall be placed in the transaction as a Co-Manager.  In such a case, the MFC shall assign one less Co-Manager from the Certified Lists.

Transactions with a principal amount over $300 Million shall be assigned to a Senior Manager and all four Co-Senior Managers.

Section 5.  The first sentence in the second paragraph of Subparagraph G. Section 5. of Ordinance No. 94-158 is deleted in its entirety and the following sentences are inserted in its place:

The County Manager shall recommend three firms on the MFC's list of all responsive firms for each of the three non-certified underwriting teams.  The County Manager shall  also recommend one firm on the MFC's list of all responsive Locally Headquartered Minority firms for each of the three underwriting teams and recommend (i) one firm from the MFC's list of all responsive Regional firms for the first of the three underwriting teams, and (ii) one firm from the MFC's list of all responsive Minority firms or the MFC's list of all responsive Regional firms for the second of the three underwriting teams, and (iii) one firm from the MFC's list of all responsive Minority firms or the MFC's list of all responsive Locally Headquartered non-Minority firms for the third of the three underwriting teams.

A Regional firm or a Minority firm shall be deemed responsive if each firm includes with its response to the County's Request for Qualifications either (i) evidence that a jurisdiction (county or municipality) in which the firm's

principal place of business is located has a policy or goal in its selection process for underwriters that affords Dade County underwriting firms reciprocity or, (ii) in the absence of such policy or goal, a certification stating that said firm understands that if such policy or goal is not implemented within one hundred and eighty (180) days of its appointment to one of the underwriting teams, it will be replaced in the manner set forth in Subparagraph J. of Section 5. of Ordinance No. 94-158.

Section 6. Unless an underwriting team has underwritten $2 Billion in bonds, in which case its appointment shall expire, the three year term shall be extended with respect to each of the underwriting teams for two additional one year terms if at the end of the third year or the fourth year, as the case may be, each member of an underwriting team has not been rotated to the position of Senior Manager.

Section 7. All references to the "Finance, Budget & Empowerment Zone Committee" are hereby deleted and "Finance and Trust Funds Committee" is inserted in their place.

Section 8. If any section, subsection, sentence, clause or provision of this Ordinance is held invalid, the remainder of this Ordinance shall not be affected by such invalidity.

Section 9. It is the intention of the Board of County Commissioners, and it is hereby ordained, that the provisions of this Ordinance shall become and be made a part of the Code of Metropolitan Dade County, Florida; and that the sections of this Ordinance may be renumbered or relettered to accomplish such intention, and the word "Ordinance" may be changed to "section," "article," or other appropriate word.

129802

Alternate No. 2
Agenda Item No. 7(D)
Page No. 6

Section 10. The provisions of this Ordinance shall become effective ten (10) days after the date of its enactment.

PASSED AND ADOPTED:     FEB 2 1 1995

Approved by County Attorney as
to form and legal sufficiency. RAB

Prepared by:

Sponsored by Commissioner James Burke, Commissioner Gwen Margolis,
Commissioner Maurice A. Ferre, and Commissioner Katy Sorenson.

129803

NOC
Substitute
Agenda Item No. 6(A)(24)
7-16-96

RESOLUTION NO. _____ R-922-96

RESOLUTION AUTHORIZING ISSUANCE OF DADE COUNTY, FLORIDA SEAPORT REVENUE BONDS, IN ONE OR MORE SERIES, IN AN AGGREGATE PRINCIPAL AMOUNT NOT TO EXCEED $30,000,000 FOR PURPOSES OF FINANCING IMPROVEMENTS TO CRUISE SHIP TERMINALS, FUNDING RESERVE ACCOUNT, IF NECESSARY, AND PAYING COSTS OF ISSUANCE, ALL PURSUANT TO SECTION 207 OF ORDINANCE NO. 88-66, AS SUPPLEMENTED AND AMENDED; PROVIDING THAT PRINCIPAL AND INTEREST SHALL BE PAYABLE SOLELY FROM NET REVENUES OF SEAPORT DEPARTMENT; APPROVING FORM AND EXECUTION OF BONDS; DELEGATING TO COUNTY MANAGER AUTHORITY TO FINALIZE TERMS AND DETAILS OF BONDS WITHIN CERTAIN PARAMETERS; APPOINTING PAYING AGENT AND BOND REGISTRAR; PROVIDING FOR BOOK ENTRY SYSTEM; FINDING NECESSITY AND PROVIDING FOR NEGOTIATED SALE OF BONDS AND AWARDING SALE TO UNDERWRITERS; APPROVING FORM AND DISTRIBUTION OF PRELIMINARY OFFICIAL STATEMENT AND DELIVERY AND DISTRIBUTION OF FINAL OFFICIAL STATEMENT; APPROVING FORM, EXECUTION AND DELIVERY OF BOND PURCHASE AGREEMENT; PROVIDING FOR CONTINUING DISCLOSURE; AUTHORIZING COUNTY MANAGER TO NEGOTIATE BOND INSURANCE POLICIES AND RESERVE FUND FACILITIES AND EXECUTE RELATED AGREEMENTS; AUTHORIZING COUNTY OFFICIALS TO DO ALL THINGS DEEMED NECESSARY IN CONNECTION WITH ISSUANCE, SALE, EXECUTION AND DELIVERY OF BONDS; PROVIDING FOR SEVERABILITY AND EFFECTIVE DATE.

WHEREAS, Dade County, Florida (the "County"), has previously issued its: (i) $6,860,000 Dade County, Florida Seaport Revenue Refunding Bonds, Series 1988C, dated October 1, 1988, and presently outstanding in the principal amount of $4,660,000; (ii) $17,000,000 Dade County, Florida Seaport Revenue Refunding Bonds, Series 1988D, dated October 1, 1988, and presently outstanding in the principal amount of $11,530,000; (iii) $29,400,000 Dade County, Florida Seaport Revenue Refunding Bonds, Series 1990E, dated July 1, 1990,

MIA:34959:1

4


PLAINTIFF'S EXHIBIT
D

and presently outstanding in the principal amount of $10,515,000;
, (iv) $6,745,000 Dade County, Florida Seaport Revenue Refunding
Bonds, Series 1990F, dated September 1, 1990, and presently
outstanding in the principal amount of $5,980,000; (v) $44,950,000
Dade County, Florida Seaport Revenue Refunding Bonds, Series 1995,
dated September 1, 1995, and presently outstanding in the principal
amount of $44,950,000; and (vi) $149,950,000 Dade County, Florida,
Seaport General Obligation Refunding Bonds, Series 1996, which
bonds are on a parity with the foregoing issues of bonds as to lien
on the Net Revenues of the Seaport Department (such outstanding
bonds referred to collectively as the "Prior Bonds"), all pursuant
to the provisions of Ordinance No. 88-66, enacted by the Board of
County Commissioners of Dade County (the "Board") on July 5, 1988,
as supplemented and amended (the "Bond Ordinance") for the purpose
of providing funds to refund certain outstanding bonds, notes and
other obligations issued or incurred by the County to finance port
facilities at the Port of Miami; and

WHEREAS, Section 207 of the Bond Ordinance provides for the
issuance of revenue bonds, which will constitute Additional Bonds
under the Bond Ordinance, for the purpose of providing funds for
paying all or any part of the cost of constructing or acquiring any
Additional Improvements (as defined in the Bond Ordinance), funding

127562

Not
Substitute
Agenda Item No. 6(A)(24)
Page No. 3

any required deposit to the Reserve Account and paying costs of issuance; and

WHEREAS, the Board has determined that it is desirable to issue revenue bonds (the "Series 1996 Revenue Bonds") pursuant to the provisions of Section 207 of the Bond Ordinance and this Resolution (the "Series 1996 Resolution") for the purposes of providing funds, together with other available funds of the Seaport Department, if any, for financing improvements to cruise ship terminals undertaken by Carnival Cruise Lines under an agreement with the County as more specifically described in the attached Exhibit A (the "Project"), funding the Reserve Account for the Series 1996 Revenue Bonds, if necessary, and paying costs of issuance; and

WHEREAS, the Board has determined that the Project will constitute Additional Improvements as defined in the Bond Ordinance; and

WHEREAS, the Taxable Bond Act of 1987, being Chapter 159, Part VII, Florida Statutes, as amended, provides for the issuance by governmental units, including the County, of bonds the interest on which is not excludable from gross income for federal income tax purposes; and

WHEREAS, as a result of the provisions of the Internal Revenue Code of 1986, as amended (the "Code") and regulations existing or



proposed under the Code, it may be necessary to issue a portion of the Series 1996 Revenue Bonds as bonds the interest on which is excludable from gross income for federal income tax purposes (the "Tax-Exempt Bonds") and the remaining portion of the Series 1996 Revenue Bonds as bonds the interest on which is not excludable from gross income for federal income tax purposes (the "Taxable Bonds"); and

WHEREAS, on this date, the Board enacted an Ordinance authorizing the issuance of the Series 1996 Revenue Bonds (the "Ordinance"); and

WHEREAS, the Board has determined that, due to the favorable market conditions, time constraints, the uncertainty inherent in a competitive bidding process and the complex nature of the security for the Series 1996 Revenue Bonds, and based upon the advice of the County's Financial Advisor for the Seaport Department and the County Manager, it is in the best interest of the County to authorize the negotiated sale of the Series 1996 Revenue Bonds; and

WHEREAS, the Board deems it appropriate to delegate to the County Manager the authority to determine various terms of the Series 1996 Revenue Bonds as provided, and subject to the limitations contained, in this Series 1996 Resolution;

NOW, THEREFORE, BE IT RESOLVED BY THE BOARD OF COUNTY COMMISSIONERS OF DADE COUNTY, FLORIDA:

**127563**

MIA:34959:1

Not
Substitute
Agenda Item No. 6(A)(24)
Page No. 5

SECTION 1.  Recitals, Definitions and Construction.

(a)  Recitals.   The  matters  contained  in  the  foregoing
recitals are incorporated in this Series 1996 Resolution by this
reference.

(b)  Definitions.  All capitalized terms used and not defined
in this Series 1996 Resolution shall have the meaning set forth for
such terms in the Bond Ordinance and the Ordinance, unless the
context otherwise clearly requires a different meaning.  Terms used
in this Series 1996 Resolution which are relevant to the provisions
of the Code but which are not defined shall have the meanings given
to them in the Code, unless the context indicates another meaning.
In addition, the following terms shall have the meanings set forth
below:

"County Manager's Certificate" means a certificate of the
County Manager confirming the terms of the Series 1996 Revenue
Bonds and addressing all other matters delegated to the County
Manager by the terms of this Series 1996 Resolution.

"Series 1996 Resolution" means this Resolution and any
resolution which amends or supplements it.

(c)  Rules of Construction.  Any reference to any article,
section or provision of the Constitution or laws of the State of
Florida, or of federal laws, or rules or regulations, shall include
such provisions as amended, modified, revised, supplemented or


MIA:34959.1

8

superseded from time to time; provided that no such change shall be deemed applicable by reason of this provision if such change by its terms is inapplicable to any particular Bonds or would, in any way, constitute an unlawful impairment of the rights of the County or any Bondholder.

Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders. Words importing singular number shall include the plural number in each case and vice versa, and words importing persons shall include firms, corporations or other entities including governments or governmental bodies.

SECTION 2. Findings. The Board finds, determines and declares as follows:

(a)  This Series 1996 Resolution constitutes a Series Resolution under the Bond Ordinance.

(b)  Based upon the advice of Rauscher Pierce Refsnes, Inc., the County's financial advisor for the Seaport Department (the "Financial Advisor"), the Finance Director and the County Manager, the negotiated sale of the Series 1996 Revenue Bonds is in the best interest of the County for the following reasons:

(i)  The complex nature of the security for the Series 1996 Revenue Bonds and the timing of the issuance of the Series 1996 Revenue Bonds require extensive planning, and it

**127564**

9

is not practical for the County, the Financial Advisor and the Underwriters to engage in such planning within the time constraints and uncertainties inherent in a competitive bidding process; and

(ii)  It is necessary to be able to sell the Series 1996 Revenue Bonds when market conditions are most favorable in order to achieve maximum debt service coverage ratios.  The vagaries of the current and near future municipal bond market demand that the initial purchasers of the Series 1996 Revenue Bonds, Howard Gary & Company, as senior manager (the "Senior Manager") and on behalf of AIBC Investment Services Corporation, Guzman & Company, Apex Securities, Inc. and LM Capital Securities, Inc. (collectively, with the Senior Manager, the "Underwriters"), have the maximum time and flexibility to price and market the Series 1996 Revenue Bonds in order to obtain the most favorable interest rates available.

SECTION 3. <u>Authorization of Series 1996 Revenue Bonds; Terms and Provisions Applicable to Series 1996 Revenue Bonds</u>.

(a) <u>**Authorization**</u>.   The Series 1996 Revenue Bonds are authorized to be issued, at one time or from time to time, pursuant to Section 207 of the Bond Ordinance and the authority granted to the County by virtue of the Constitution and laws of the State of


MIA 14959.1

Florida, including but not limited to Chapters 125, 159 and 166, Florida Statutes, as amended, and the Metropolitan Dade County Home Rule Amendment and Charter, as amended, for the purposes of providing funds, together with other available funds of the Seaport Department, if any, for financing costs of the Project, funding the Reserve Account for the Series 1996 Revenue Bonds, if necessary, and paying costs of issuance. The aggregate principal amount of the Series 1996 Revenue Bonds shall not exceed $30,000,000, with the exact aggregate principal amount to be determined by the County Manager prior to the execution and delivery of the Bond Purchase Agreement pursuant to Section 7 of this Series 1996 Resolution and to be set forth in the County Manager's Certificate.

(b)  <u>Denominations, Dates and Other Details</u>.  The specific aggregate principal amount for each Series of the Series 1996 Revenue Bonds shall be determined by the County Manager after consultation with the Finance Director and the Financial Advisor and set forth in the County Manager's Certificate.  The Series 1996 Revenue Bonds shall be designated "Dade County, Florida Seaport Revenue Bonds," with such Series designations as shall be determined by the County Manager, shall be issued in fully registered form as provided in Section 203 of the Bond Ordinance, and shall be in the denominations of $5,000 or any integral multiple of $5,000.  The Series 1996 Revenue Bonds shall be issued

**127565**

Not
Substitute
**Agenda Item No.  6(A)(24)**
**Page No. 9**

in one or more Series, shall be issued as Tax-Exempt Bonds and/or Taxable Bonds in such principal amounts, shall be dated and issued at such time or times, shall be in the form of Serial Bonds and/or Term Bonds, shall have such Interest Payment Dates, shall be stated to mature, or, as to any Term Bonds, shall have Amortization Requirements payable in such amounts and on such dates, and shall be subject to redemption prior to maturity, all as determined by the County Manager after consultation with the Financial Advisor and the Finance Director, in accordance with the terms of this Series 1996 Resolution and established in the Bond Purchase Agreement, all as set forth in the County Manager's Certificate; provided, however, that the effective interest cost of (i) the Taxable Bonds shall not exceed 9.5% nor the maximum interest rate set forth in Section 159.825, Florida Statutes and (ii) the Tax-Exempt Bonds shall not exceed 7.5% nor the maximum interest rate set forth in Section 215.84, Florida Statutes.  The Series 1996 Revenue Bonds or any portion of the Series 1996 Revenue Bonds may be sold at an original issue discount as determined by the County **Manager after consultation with the Finance Director and the Financial Advisor and as shall be set forth in the County Manager's Certificate.  The effective interest cost will be determined by** doubling the semi-annual interest rate (compounded semi-annually) necessary to discount the total amount of debt service payments

MIA:34959:1

Not O'
Substitu...
Agenda Item No. 6(A)(24)
Page No. 10

(for the period of time from the date of the applicable Series 1996 Revenue Bonds to the debt service payment dates) to the amount of the purchase price set forth in the Bond Purchase Agreement, not including interest accrued to the date of delivery. Term Bonds, if any, will be callable at par (or if applicable, Accreted Value) with accrued interest, without premium, each year in amounts equal to their respective Amortization Requirements. The Series 1996 Revenue Bonds shall be sold to the Underwriters as provided in Section 7 of this Series 1996 Resolution at an Underwriter's discount of no more than two percent (2%) of the aggregate principal amount of the Series 1996 Revenue Bonds. Subject to the foregoing, the aggregate principal amounts, maturities (not to exceed 40 years), interest rates and other terms of the Series 1996 Revenue Bonds shall be as approved and determined by the County Manager after consultation with the Finance Director and the Financial Advisor and set forth in the Bond Purchase Agreement and the County Manager's Certificate, with the execution and delivery of the Bond Purchase Agreement and the County Manager's Certificate by the County Manager being conclusive evidence of the Board's approval of such items. The form of the Series 1996 Revenue Bonds shall be as provided in the Bond Ordinance and may include such legends or text as may be necessary or appropriate to conform to any applicable rules and regulations of any governmental authority

Not
Substitute
Agenda Item No. 6(A)(24)
Page No. 11

or any usage or requirement of law.  The execution and delivery of the Series 1996 Revenue Bonds as described above is authorized. The execution and delivery of the Series 1996 Revenue Bonds for and on behalf of the County, with a facsimile or manual signature by the Chairperson, with the official seal of the Board impressed or imprinted on the Series 1996 Revenue Bonds and attested with a facsimile or manual signature by the Clerk, are authorized.

(c)  <u>Interest Payment by Wire Transfer</u>.  In accordance with the provisions of Section 202 of the Bond Ordinance, it is determined that interest on the Series 1996 Revenue Bonds may be paid by wire transfer on each Interest Payment Date to any holder of Series 1996 Revenue Bonds of at least $1,000,000 who has requested the Paying Agent in writing not later than the day preceding the Record Date for such Interest Payment Date for such payment by wire transfer; and provided further that such request may be for more than one Interest Payment Date.

(d)  <u>Limited Obligations of County</u>.  In accordance with the provisions of the Bond Ordinance, the Series 1996 Revenue Bonds shall be limited obligations of the County, payable solely from the Net Revenues of the Seaport Department.  The Series 1996 Revenue Bonds do not constitute an indebtedness, liability, general or moral obligation, or a pledge of the faith, credit or taxing power of the County, the State of Florida or any political subdivision of

MIA:959:1

14

Not O‾
Substitu. ⁊

Agenda Item No. 6(A)(24)
Page No. 12

the State of Florida, within the meaning of any constitutional,
statutory or charter provisions. Neither the State of Florida or
any political subdivision of the State of Florida nor the County
shall be obligated (1) to levy ad valorem taxes on any property to
pay the principal of the Series 1996 Revenue Bonds, the interest on
the Series 1996 Revenue Bonds or other related costs, or (2) to pay
the same from any other funds of the County except from the Net
Revenues of the Seaport Department. The acceptance of the Series
1996 Revenue Bonds by any Bondholder shall be deemed an agreement
between the County and such Bondholder that said Series 1996
Revenue Bonds and the indebtedness evidenced by the Series 1996
Revenue Bonds shall not constitute a lien upon the property of the
County, but shall constitute a lien only on the Net Revenues of the
Seaport Department.

SECTION 4. Use of Proceeds. Subject to the provisions of the
Bond Ordinance, the proceeds, including accrued interest, received
from the sale of the Series 1996 Revenue Bonds, shall be deposited
by the County, simultaneously with delivery of the Series 1996
Revenue Bonds, as authorized in this Series 1996 Resolution and
**shall be applied to finance improvements to cruise ship terminals,**
**funding a reserve account, if necessary, and paying the costs of**
**issuance, all as provided in a certificate of the Finance Director**
**delivered concurrently with the issuance of the Series 1996 Revenue**

**127567**

Not
Substitute
Agenda Item No. 6(A)(24)
Page No. 13

Bonds.  A special account in the Construction Fund appropriately
designated to identify its use for Project costs in connection with
the Series 1996 Revenue Bonds shall be established by the County.

SECTION 5.  Authorization for Appointment of Paying Agent and
Bond Registrar.  SunTrust Bank, Central Florida, National
Association, Orlando, Florida, is  appointed as the Bond Registrar
and Paying Agent under the Bond Ordinance for the Series 1996
Revenue Bonds.

SECTION 6.  Authorization of Authentication and Delivery of
Series 1996 Revenue Bonds.  The Bond Registrar is authorized and
directed to authenticate and deliver the Series 1996 Revenue Bonds
to or on the order of the Underwriters upon payment of the purchase
price of such Series 1996 Revenue Bonds by the Underwriters.

SECTION 7.  Award of Series 1996 Revenue Bonds in Negotiated
Sale; Approval of Bond Purchase Agreement.  The Board approves the
Bond Purchase Agreement in substantially the form on file at the
Clerk's office as Exhibit B to this Series 1996 Resolution (the
"Bond Purchase Agreement"), with such variations, omissions and
insertions as may be necessary to evidence the final terms of the
Series 1996 Revenue Bonds.  Upon compliance by the Underwriters
with the requirements of Section 218.385(6), Florida Statutes, the
County Manager is authorized to finalize the terms of, and to
execute the Bond Purchase Agreement, and to deliver said Bond

Purchase Agreement to the Underwriters after consultation with the Finance Director and the Financial Advisor.  The Board approves the negotiated sale of the Series 1996 Revenue Bonds to the Underwriters on the terms and conditions and as set forth in this Series 1996 Resolution and the Bond Purchase Agreement, with such additions, deletions and completions as may be approved by the County Manager after consultation with the Finance Director and the Financial Advisor.  The aggregate principal amounts, maturities, interest rates, prices, optional and mandatory redemption provisions and other terms of the Series 1996 Revenue Bonds as more fully described in the Bond Purchase Agreement shall be established by the County Manager within the parameters set forth in Sections 3 and 4 of this Series 1996 Resolution.  The execution and delivery of the Bond Purchase Agreement by the County Manager shall be conclusive evidence of the Board's approval of any such variations, omissions and insertions.

SECTION 8.  <u>System of Certificated and Uncertificated Registration</u>.  There is established a system of registration with respect to the Series 1996 Revenue Bonds as permitted by Chapter 279, Florida Statutes, as amended, pursuant to which both certificated and uncertificated registered Series 1996 Revenue Bonds may be issued.  The system shall be as described in the final Official Statement.  The Series 1996 Revenue Bonds shall be initially issued

**127568**

Not
Substitu..e
Agenda Item No. 6(A)(24)
Page No. 15

through the Book-Entry Only System maintained by The Depository
Trust Company ("DTC") which will act as securities depository for
the Series 1996 Revenue Bonds, pursuant to the terms of a Blanket
Letter of Representations between the County and DTC dated
September 20, 1995.   The County reserves the right to amend,
discontinue or reinstated such Book-Entry Only System from time to
time, subject to the rights of Bondholders contained in the Bond
Ordinance and this Series 1996 Resolution.

     Neither the County nor the Paying Agent shall be liable for
the failure of the securities depository of the Series 1996 Revenue
Bonds to perform its obligations as described in the Official
Statement, nor for the failure of any participant in the Book-Entry
Only System maintained by the securities depository to perform any
obligation such participant may have to a beneficial owner of any
Series 1996 Revenue Bonds.

     SECTION 9.  Approval of the Preliminary Official Statement and
Final Official Statement.   The use and distribution by the
Underwriters of the Preliminary Official Statement in connection
with the offering of the Series 1996 Revenue Bonds for sale by the
Underwriters   (the   "Preliminary   Official   Statement")   in
substantially the form on file at the Clerk's office as Exhibit C
to this Series 1996 Resolution is approved, and such Preliminary
Official Statement is deemed "final" for purposes of Rule 15c2-

18

12(b)(1) of the United States Securities and Exchange Commission (the "Rule").  The County Manager is authorized to cause such Official Statement to be delivered to the Underwriters within seven (7) business days of the execution of the Bond Purchase Agreement, with such changes, insertions and deletions from the Preliminary Official Statement as shall be approved by him in consultation with the Finance Director, the Financial Advisor, the County Attorney and Co-Bond Counsel, with the delivery of such document to be conclusive evidence of the Board's approval of any such changes, insertions or deletions.  For purposes of this Series 1996 Resolution, "business days" shall mean weekdays on which banks in the County are open for business. The use and distribution by the Underwriters of the Official Statement in connection with the  sale of the Series 1996 Revenue Bonds is authorized and approved.  If so requested by the Underwriters, the County Manager, after consultation with the Financial Advisor, Finance Director, County Attorney and Co-Bond Counsel, is authorized to make any necessary certifications to the Underwriters with respect to the Preliminary Official Statement and Official Statement as may be required under the provisions of the Rule.

SECTION 10.  Bond Insurance Policies and Reserve Fund Facilities.  If deemed necessary or advisable and upon the advice of the Financial Advisor, the County Manager is authorized to

**127569**

Not
Substitute
Agenda Item No.  6(A)(24)
Page No. 17

secure one or more Credit Facilities, Reserve Account Insurance
Policies and/or Reserve Account Letters of Credit (collectively,
the "Credit Enhancements") with respect to any or all Series or
maturities of the Series 1996 Revenue Bonds, and to execute and
deliver on behalf of the County any agreements with any Credit
Provider or other provider of a Credit Enhancement. The County
Manager is authorized to provide for the payment of any premiums on
or fees for such Credit Enhancements from the proceeds of the
issuance of the Series 1996 Revenue Bonds, and the County Manager
is authorized to enter into, execute and deliver such agreements as
may be necessary to secure such Credit Enhancements, with the
County Manager's execution of any such agreement to be conclusive
evidence of the Board's approval of such agreement.

Any agreements with a Credit Provider or other provider of a
Credit Enhancement shall supplement and be in addition to the
provisions of the Bond Ordinance and this Series 1996 Resolution.

SECTION 11.  Continuing Disclosure.

(a)  The Board agrees, in accordance with the provisions of,
and to the degree necessary to comply with, the secondary
disclosure requirements of the Rule, to provide or cause to be
provided for the benefit of the beneficial owners of the Series
1996 Revenue Bonds (the "Beneficial Owners") to each nationally
recognized municipal securities information repository ("NRMSIR"),

Not Or
Substitu
Agenda Item No. 6(A)(24)
Page No. 18

and to the appropriate state information depository ("SID"), if
any, designated by the State of Florida, the following annual
financial information (the "Annual Information"), commencing with
the Fiscal Year ended September 30, 1996:

(1)     With  respect  to  the  Seaport  Department,  Revenues,
        Operating Expenses (Seaport Operations), Net Revenues of
        the  Seaport  Department  and  statistical  information
        concerning  the  number  of  cruise  line  passengers  and
        volume of cargo tonnage, amount of Bonds outstanding and
        debt  service  coverage  on  indebtedness  secured  by  Net
        Revenues of the Seaport Department, all in a form which
        is  generally  consistent  with  the  presentation  of  such
        information in the Official Statement for the Series 1996
        Revenue Bonds.

(2)     Audited financial statements with respect to the County's
        Seaport    Department    utilizing    generally    accepted
        accounting principles applicable to local governments.

     The  information  in  paragraphs  (1)  and  (2)  above  will  be
available for each Fiscal Year on or before 243 days after the end
of  such  Fiscal  Year,  commencing  June  1,  1997,  and  will  be  made
available, in addition to each NRMSIR and SID, to each Beneficial
Owner  of  the  Series  1996  Revenue  Bonds  who  requests  such
information in writing.  The financial statements referred to in

MIA:34959:1

127570

Not
Substitute
Agenda Item No. 6(A)(24)
Page No. 19

paragraph (2) above may be available separately from the information in paragraph (1) above and will be provided by the County as soon as practical after acceptance of such statements from the auditors by the County; if not available within eight (8) months after the end of the Fiscal Year, unaudited information will be provided in accordance with the time frame set forth above.

(b) The County agrees to provide or cause to be provided, in a timely manner, to (i) each NRMSIR or to the Municipal Securities Rulemaking Board ("MSRB"), and (ii) the SID, notice of occurrence of any of the following events with respect to the Series 1996 Revenue Bonds, if such event is material:

(1) principal and interest payment delinquencies;

(2) non-payment related defaults;

(3) unscheduled draws on debt service reserves reflecting financial difficulties;

(4) unscheduled draws on credit enhancements reflecting financial difficulties;

(5) substitution of credit or liquidity providers, or their failure to perform;

(6) adverse tax opinions or events affecting the tax-exempt status of the Series 1996 Revenue Bonds;

(7) modifications to rights of Bondholders or Beneficial Owners of the Series 1996 Revenue Bonds;



MIA:34959:1

22

Not C‾‾
Substit‾‾‾
Agenda Item No.  6(A)(24)
Page No. 20

(8)   bond calls;

(9)   defeasance;

(10)  release, substitution or sale of any property securing repayment of the Series 1996 Revenue Bonds (the Series 1996 Revenue Bonds are secured solely by the Net Revenues of the Seaport Department);

(11)  rating changes.

(c)  The County agrees to provide or cause to be provided, in a timely manner, to (i) each NRMSIR or to the MSRB, and (ii) the SID, notice of its failure to provide the Annual Information with respect to itself on or prior to 243 days following the end of the preceding Fiscal Year.

(d)  The obligations of the County under this Section shall remain in effect only so long as the Series 1996 Revenue Bonds are Outstanding.  The County reserves the right to terminate its obligations to provide the Annual Information and notices of material events, as set forth above, if and when the County no longer remains an "obligated person" with respect to the Series 1996 Revenue Bonds within the meaning of the Rule.

(e)  The County agrees that its undertaking pursuant to the Rule set forth in this Section is intended to be for the benefit of the Beneficial Owners of the Series 1996 Revenue Bonds and shall be enforceable by such Beneficial Owners if the County fails to cure

**127571**

a breach within a reasonable time after receipt of written notice
from a Beneficial Owner that a breach exists; provided that any
such Beneficial Owner's right to obtain specific performance of the
County's obligations under this Section in a federal or state court
and any failure by the County to comply with the provisions of this
undertaking shall not be a default with respect to the Series 1996
Revenue Bonds.

(f) Notwithstanding the foregoing, each NRMSIR to which
information shall be provided shall include each NRMSIR approved by
the Securities and Exchange Commission prior to the issuance of the
Series 1996 Revenue Bonds.  In the event that the Securities and
Exchange Commission approves any additional NRMSIRs after the date
of issuance of the Series 1996 Revenue Bonds, the County shall
provide such information to the additional NRMSIRs.  Failure to
provide information to any new NRMSIR whose status as a NRMSIR is
unknown to the County shall not constitute a violation of the Rule.

(g) Additionally, the requirements of subsection (a) above do
not necessitate the preparation of any separate annual report
addressing only the Series 1996 Revenue Bonds.  **The requirements of
subsection (a) may be met by the filing of an annual information
statement or the County's Comprehensive Annual Financial Report,**
provided such report includes all of the required annual
information and is available for each Fiscal Year within 243 days

after the end of such Fiscal Year.  Additionally, the County may incorporate any information in any prior filing with each NRMSIR and the SID or included in any official statement of the County, provided such official statement is filed with the Municipal Securities Rulemaking Board.

(h)   The County reserves the right to modify from time to time the specific types of information provided or the format of the presentation of such information, to the extent necessary or appropriate in the judgment of the County; provided that the County agrees that any such modification will be done in a manner consistent with the Rule.

The County agreements as to secondary disclosure (the "Agreements") may only be amended if:

(1)   the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, a change in law or a change in the identity, nature or status of the County or type of business conducted; the Agreements, as amended, would **have complied with the requirements of the Rule at the time of award of the Series 1996 Revenue Bonds,** after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interests of the Beneficial Owners, as

**127572**

Not (
Substitute
Agenda Item No.  6(A)(24)
Page No. 23

determined by Co-Bond Counsel or other independent counsel knowledgeable in the area of federal securities laws and regulations; or

(2)   all or any part of the Rule, as interpreted by the staff of the Securities and Exchange Commission at the date of the adoption of this Series 1996 Resolution, ceases to be in effect for any reason, and the County elects that the Agreements shall be deemed amended accordingly.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

The Board further authorizes and directs the Finance Director to cause all other agreements to be made or action to be taken as required in connection with meeting the County's obligations as to the Agreements.  The Finance Director shall further be authorized to make such additions, deletions and modifications to the Agreements as he shall deem necessary or desirable in consultation with the County Attorney and Bond Counsel.  The execution of the final Official Statement containing any such additions, deletions and modifications for and on behalf of the County by the Chairperson shall be conclusive evidence of the Board's approval of any such additions, deletions and modifications.

MIA:34959:1

Not Of
Substi.. )
Agenda Item No. 6(A)(24)
Page No. 24

SECTION 13.   <u>Modification or Amendment</u>.   This Series 1996
Resolution shall constitute a contract between the County and the
Bondholders from time to time of the Series 1996 Revenue Bonds.  No
material amendment or modification of this Series 1996 Resolution
may be made without the consent of the Owners of fifty-one percent
(51%) or more of the Series 1996 Revenue Bonds then Outstanding;
<u>provided, however</u>, that no amendment or modification shall permit
an extension of the maturity of such Series 1996 Revenue Bonds, a
reduction in the redemption premium or rate of interest on the
Series 1996 Revenue Bonds or in the amount of the principal
obligation of the Series 1996 Revenue Bonds, the creation of a lien
upon or pledge of Net Revenues of the Seaport Department other than
a lien or pledge as specified in the Bond Ordinance, a preference
or priority of any Series 1996 Revenue Bond over any other Series
1996 Revenue Bond or a reduction in the aggregate principal amount
of Series 1996 Revenue Bonds required for consent to amendment or
modification of this Series 1996 Resolution.

Notwithstanding anything in this Series 1996 Resolution to the
contrary, this Series 1996 Resolution may be amended without the
consent of Bondholders to provide clarification, correct omissions,
make technical changes, comply with state laws or to make such
additions, deletions or modifications as may be necessary to assure
compliance with Section 148 of the Code or otherwise as may be

MIA:34959:1

**127573**

necessary to assure exclusion from gross income for federal income tax purposes of interest on the Series 1996B Bonds, and such other amendments that do not materially adversely affect the interests of the Bondholders of Bonds then Outstanding.

SECTION 13.   <u>Tax Covenants</u>.   Notwithstanding any other provision of the Bond Ordinance, including in particular Article XI of the Bond Ordinance, or any provision of this Series 1996 Resolution, the obligation to pay over the Rebate Amount to the United States of America and to comply with all other requirements of Section 713 of the Bond Ordinance shall survive the defeasance or payment in full of the Tax-Exempt Bonds.

SECTION 14.   <u>Authorization of Further Actions; Additional Covenants and Agreements</u>.   The Chairperson, the County Manager, the Finance Director, the County Attorney, the Clerk and other officers, employees and agents of the County are authorized and directed, collectively or individually, to do all acts and things and to execute and deliver any and all documents and certificates on behalf of the County which they deem necessary or desirable in order to consummate the issuance of the Series 1996 Revenue Bonds and otherwise to carry out, give effect to and comply with the terms and intent of the Bond Ordinance, the Ordinance, this Series 1996 Resolution, the Series 1996 Revenue Bonds and the documents described in this Series 1996 Resolution.   Such officers and others

designated by such officers are charged with the responsibility for the issuance of the Series 1996 Revenue Bonds.

SECTION 15. <u>Severability: Resolution Controlling</u>. In case any one or more of the provisions of this Series 1996 Resolution or any document approved by this Series 1996 Resolution shall for any reason be held to be illegal or invalid, such illegality or invalidity shall not affect the legality of any other provisions of this Series 1996 Resolution or such document, as the case may be. All resolutions or proceedings, or parts of any of them, in conflict with the provisions of the Series 1996 Resolution are to the extent of such conflict repealed or amended to the extent of such inconsistency.

SECTION 16. <u>Governing Law</u>. The Series 1996 Revenue Bonds are to be issued and this Series 1996 Resolution is adopted and such other instruments necessary for the issuance of the Series 1996 Revenue Bonds shall be executed and delivered with the intent that the laws of the State of Florida shall govern their construction unless otherwise expressly stated in such documents.

SECTION 17. <u>Effective Date</u>. This Series 1996 Resolution shall take effect concurrently with the Ordinance.

On
stitute
Agenda Item No. 6(A)(24)
Page No. 27

The foregoing resolution was offered by Commissioner
**James Burke**      who moved its adoption.  The motion was seconded
by Commissioner      **Gwen Magolis**                and upon being put
to a vote, the vote was as follows:

| | | | |
|---|---|---|---|
| James Burke | aye | Miguel Diaz de la Portilla | aye |
| Betty T. Ferguson | aye | Maurice A. Ferre | absent |
| Bruce Kaplan | absent | Gwen Margolis | aye |
| Natacha S. Millan | aye | Dennis C. Moss | aye |
| Alexander Penelas | aye | Pedro Reboredo | aye |
| Katy Sorenson | aye | Javier D. Souto | aye |
| | Arthur E. Teele, Jr. | aye | |

The Chairperson thereupon declared this resolution duly passed
and adopted this  18th day of July, 1996.



DADE COUNTY, FLORIDA BY ITS
BOARD OF COUNTY COMMISSIONERS

HARVEY RUVIN, CLERK

**KAY SULLIVAN**

Approved by County Attorney as to       By:_____
form and legal sufficiency.                                    Deputy Clerk

Co-Bond Counsel:
Ruden, McClosky, Smith, Schuster & Russell, P.A.
**Lacasa & Associates**

**127360**

MIA:34959:1

30

EXHIBIT A

Description of the Project

The Project consists of improvements to the Seaport's Passenger Terminals 8 and 9 and Transit Shed B to provide additional passenger terminal facilities, warehouse space and office space to accommodate two new mega-cruise ships. The improvements were undertaken by Carnival Corporation ("Carnival") pursuant to a Master Agreement, dated as of February 1, 1995, between the County and Carnival.

**127574**

MIA:34959:1

21

EXHIBIT B

Form of Bond Purchase Agreement

(ON FILE WITH THE CLERK'S OFFICE)



MIA:34959:1

EXHIBIT C


Form of Preliminary Official Statement



(ON FILE WITH THE CLERK'S OFFICE)

MIA:34959:1

**127575**

33

STATE OF FLORIDA )
                 ) SS:
COUNTY OF DADE )

       I, HARVEY RUVIN, Clerk of the Circuit Court in and for Dade County, Florida, and Ex-Officio Clerk of the Board of County Commissioners of said County, DO HEREBY CERTIFY that the above and foregoing is a true and correct copy of Resolution No. _____R-922-96_____, adopted by the said board of County Commissioners at its meeting held on _____July 18th_____ 19 96.

      IN WITNESS WHEREOF, I have hereunto set my hand and official seal on this __16th__ day of ___Oct___ , A.D. 19 96.

HARVEY RUVIN, Clerk
Board of County Commissioners
Dade County, Florida



By _____
                 Deputy Clerk

SEAL

Board of County Commissioners
Dade County, Florida

129576

CLK/CT 587  3/93

# MEMORANDUM

Not On
Substitute
Agenda Item No. 6(A)(24)

| | |
|---|---|
| **TO:** Hon. Chairperson and Members Board of County Commissioners | **DATE:** July 16, 1996 |
| **FROM:** Armando Vidal, P.E. County Manager | **SUBJECT:** Resolution Authorizing Issuance Seaport Revenue Bonds, Series 1996 |

## RECOMMENDATION:

It is recommended that the Board adopt the accompanying resolution (the "Series 1996 Resolution") authorizing the issuance, in one or more series, of Seaport Revenue Bonds, Series 1996 (the "Series 1996 Revenue Bonds") in an aggregate principal of not to exceed $30,000.000 to: (i) finance improvements to cruise ship terminals undertaken by Carnival Cruise Lines under an agreement with the County, as more specifically described in Exhibit A to this Series 1996 Resolution (the "Project"); (ii) fund a Reserve Account for the Series 1996 Revenue Bonds, if necessary; and (iii) pay the costs associated with the issuance of the Series 1996 Revenue Bonds.

This Series 1996 Resolution additionally: (i) provides for the negotiated sale of the Series 1996 Revenue Bonds and authorizes the County Manager to award the Series 1996 Revenue Bonds to  Howard Gary & Company, as senior manager, on behalf of the Underwriters named in the Bond Purchase Agreement; (ii) authorizes the County Manager to finalize terms and details of the Series 1996 Revenue Bonds within certain parameters;  (iii) approves the use, execution and delivery of various bond related documents substantially in the form on file in the Clerk's Office, as exhibits to this Series 1996 Resolution; and (iv) authorizes officers of the County to take all necessary action in connection with the issuance of the Series 1996 Revenue Bonds.

This Substitute Series 1996 Resolution differs from the original Series 1996 Resolution in that it corrects scrivener errors and clarifies certain ambiguities.

## BACKGROUND:

On July 5, 1988, the Board enacted Ordinance No. 88-66 (the "Bond Ordinance") pursuant to which, the County issued several series of Seaport Revenue Bonds to refund certain outstanding bonds, notes and other obligations issued or incurred by the County to finance port facilities at the Port of Miami. Section 207 of the Bond Ordinance provides for the issuance of Additional Bonds for authorized improvements to the Seaport.

On July 26, 1994 adopted Resolution No. R-1243-94 authorizing the negotiation and execution of contract documents with Carnival Cruise Lines for the financing and construction of renovations to passenger terminals 8 and 9, in an amount not to exceed $25,000,000.

**129361**

Hon. Chairperson and Members
Board of County Commissioners
Page No. 2

On February 1, 1995, pursuant to Resolution No. R-1234-94, the County entered into an agreement (the "Master Agreement") with Carnival Corporation ("Carnival") whereby Carnival agreed to facilitate the immediate financing and to undertake capital improvements to Terminal 8 and 9 and Transit Shed B (the"Improvements") at the Port of Miami with the County's pledge to reimburse Carnival at the completion of the Improvements. The Board approved the Improvements at this time.

It was determined that in order to reimburse Carnival for the Improvements, the County must issue additional bonds under the Bond Ordinance. At today's meeting and presented under a separate Agenda Item, the Board is being requested to enact an ordinance (the "Ordinance") which provides for the issuance of not to exceed $30,000,000 Dade County, Florida Seaport Revenue Bonds, Series 1996 and provides for the establishment of terms, maturities, interest rates and other details of the Series 1996 Revenue Bonds by submission of a series resolution to the Board.

The Series 1996 Resolution additionally provides for numerous related authorizations and approvals required, including:

* authorizing the County Manager to award the Series 1996 Revenue Bonds to Howard Gary & Company, as senior manager, on behalf of the Underwriter's named in the Bond Purchase Agreement, provided the effective interest cost will not exceed 9.5% for any Taxable Series 1996 Revenue Bonds and 7.5% for any Tax-Exempt Series 1996 Revenue Bonds;

* approving the use of bond proceeds to fund the Project, as described in Exhibit A attached to this Series 1996 Resolution;

* approving the execution and delivery of the Bond Purchase Agreement substantially in the form on file with the Clerk's Office as Exhibit "B" to this Series 1996 Resolution;

* appointing SunTrust Bank, Central Florida, National Association, Orlando, Florida as Paying Agent, Registrar, and Authenticating Agent for the Series 1996 Revenue Bonds;

* approving the form and distribution of a Preliminary Official Statement in substantially the form on file with the Clerk's Office as Exhibit "C" to the Series 1996 Resolution;

* allowing for the distribution of a final Official Statement in connection with the sale of the Series 1996 Revenue Bonds;

* providing for Continuing Disclosure Commitment, as required under the provisions of Rule 15c2-12, as amended, of the Securities and Exchange Commission;

* providing for the use of a book-entry only system of registration for the Series 1996 Revenue Bonds;

Hon. Chairperson and Members
Board of County Commissioners
Page No. 3


* authorizing the County Manager to negotiate and execute Bond Insurance Policy, Reserve Fund Facilities, if advisable, in connection with the issuance of the Series 1996 Revenue Bonds; and

* authorizing the appropriate officials of the County to take all necessary actions in connection with the issuance of the Series 1996 Bonds and the Closing of this transaction.

The Finance & Trust Funds Committee, at its meetings of April 17, 1996 and July 10, 1996 approved this financing for submission to the Board.

127559

3

Approved_____Mayor

Veto          _____

Override      _____

Agenda Item No.  6(E)(2)(A)
5-19-98

## RESOLUTION NO.   R-543-98

### RESOLUTION REMOVING HOWARD GARY & COMPANY
### FROM COUNTY'S UNDERWRITING POOL

WHEREAS, Howard Gary & Company is currently under suspension from the County's

underwriting pool as a result of certain allegations regarding one of its principals, Howard Gary, with

respect to a federal investigation known as Operation Greenpalm; and

WHEREAS, it has recently been reported that an executive of Howard Gary & Company has

recently been fined and suspended by the National Association of Securities Dealers ("NASD") since

he was found responsible by NASD for sending a phony letter to a County Commissioner and three

newspapers which alleged securities violations by a County financial advisor; and

WHEREAS, as a result of the fraudulent letter sent by one of Howard Gary & Company's

executives, the County suspended an innocent firm from a lucrative bond deal, causing the County

to be unnecessarily involved in litigation; and

WHEREAS, as a result of this latest development the County wishes to drop Howard

Gary & Company from the County's underwriting pool,

NOW, THEREFORE, BE IT RESOLVED BY THE BOARD OF COUNTY

COMMISSIONERS OF MIAMI-DADE COUNTY, FLORIDA, that it is in the best interests of the

citizens of the Miami-Dade County to drop Howard Gary & Company from the County's

underwriting pool in light of the reported actions taken by NASD against an executive of Howard

Gary & Company.



PLAINTIFF'S
EXHIBIT
E

2

# MEMORANDUM

Agenda Item No.  6(E)(2)(A

| | | | |
|---|---|---|---|
| **TO:** | Hon. Chairperson and Members<br>Board of County Commissioners | **DATE:** | May 19, 1998 |
| **FROM:** | Robert A. Ginsburg<br>County Attorney | **SUBJECT** | Removal of Howard Gary<br>& Co. from underwriting pool |

The accompanying resolution was prepared and placed on the agenda at the request of Commissioner Jimmy L. Morales.

Robert A. Ginsburg
County Attorney

RAG/bw

/

Agenda Item No.  6(E)(2)(A)
Page No.   2

The foregoing Resolution was sponsored by Commissioner Jimmy L. Morales and offered

by Commissioner          Jimmy  L.  Morales          who moved its adoption.  The motion was

seconded by Commissioner          Natacha S. Millan          and upon being put to a vote, the vote

was as follows:

| | | | |
|---|---|---|---|
| Dr. Miriam Alonso | aye | Dr. Barbara M. Carey | absent |
| Miguel Diaz de la Portilla | aye | Betty T. Ferguson | aye |
| | | Gwen Margolis | aye |
| Natacha Seijas Millán | aye | Jimmy L. Morales | aye |
| Dennis C. Moss | aye | Pedro Reboredo | absent |
| Dorrin D. Rolle | absent | Katy Sorenson | absent |
| | Javier D. Souto | absent | |

The Chairperson thereupon declared the resolution duly passed and adopted this 19th day of

May, 1998   This resolution shall become effective ten (10) days after the date of its adoption unless

vetoed by the Mayor, and if vetoed, shall become effective only upon an override by this Board.

MIAMI-DADE COUNTY, FLORIDA
BY ITS BOARD OF
COUNTY COMMISSIONERS

HARVEY RUVIN, CLERK

Approved by County Attorney as
to form and legal sufficiency.

By: KAY SULLIVAN
Deputy Clerk

3

# DADE COUNTY EXPRESSWAY AUTHORITY (DCEA)
## RESOLUTION # 96-7

## RESOLUTION DESIGNATING A TEAM OF UNDERWRITERS WITH RESPECT TO THE PROPOSED NEGOTIATED SALE OF AUTHORITY BONDS TO PROVIDE FUNDS TO ENABLE THE AUTHORITY TO ACQUIRE THE DADE COUNTY EXPRESSWAY SYSTEM; PROVIDING FOR SEVERABILITY AND PROVIDING AN EFFECTIVE DATE.

WHEREAS, Dade County Expressway Authority ("DCEA") is a body politic and corporate, a public instrumentality and an agency of the State established under and pursuant to the Florida Expressway Authority Act, Part I of Chapter 348, Florida Statutes, as amended (the "Act"); and

WHEREAS, the Act confers upon DCEA the power to issue bonds to finance an expressway system within the geographic boundaries of DCEA; and

WHEREAS, DCEA desires to issue one or more series of bonds (the "Bonds") for the purpose of acquiring control of the Dade County Expressway System presently controlled by the Department of Transportation of the State of Florida; and

WHEREAS the Act requires that the Bonds be sold by DCEA at public sale by competitive bid, unless, DCEA, after receipt of a written recommendation from a financial adviser, shall determine by official action after public hearing by a two-thirds vote of all voting members of DCEA that a negotiated sale of the Bonds is in the best interest of the Authority, in which event the Bonds may be sold by DCEA pursuant to a negotiated sale; and

WHEREAS, Rauscher Pierce Refsnes, Inc. and AIBC Investment Services Corporation, financial advisers to DCEA have submitted to DCEA their written recommendation that the Authority sell the Bonds pursuant to a negotiated sale; and

WHEREAS, after complying with the necessary pre-conditions set forth above, DCEA has duly approved the sale of the Bonds on a negotiated basis; and

WHEREAS, pursuant to DCEA RFQ No. 000003, DCEA has previously requested statements of qualifications and proposals from firms interested in providing underwriting services to DCEA in connection with the proposed negotiated sale of the Bonds; and


PLAINTIFF'S EXHIBIT

WHEREAS, nineteen firms submitted responses to RFQ No. 000003, which responses were evaluated by DCEA's financial advisers according to criteria previously approved by the DCEA Budget and Finance Committee; and

WHEREAS, six firms shortlisted as a result of such evaluation made presentations to the DCEA Budget & Finance Committee on August 7, 1996 to act as Senior Manager for the proposed negotiated sale of the Bonds; and

WHEREAS, the Act requires that the underwriters also be designated by Dade County;

NOW, THEREFORE, BE IT RESOLVED BY THE DADE COUNTY EXPRESSWAY AUTHORITY:

Section 1.  DCEA hereby designated the firms set forth on Exhibit A hereto to comprise the underwriting team for the proposed negotiated sale of the Bonds, with each such firm to occupy the position within the team identified on such Exhibit A.

Section 2.  DCEA hereby requests that Dade County approve the designation of the underwriting team as set forth on Exhibit A hereto and hereby authorizes the Executive Director to take such actions as may be necessary to secure such approval.

Section 3.  If any section, paragraph, clause or provision of this Resolution shall be held to be invalid or ineffective for any reason, the remainder of this Resolution shall continue in full force and effect, it being expressly hereby found and declared that the remainder of this Resolution would have been adopted despite the invalidity or ineffectiveness of such section, paragraph, clause or provision.

Section 4.  This Resolution shall take effect immediately upon its adoption, and any provisions of any previous resolutions in conflict with the provisions herein are hereby superseded.

2

MDX00040

The foregoing resolution was offered by Board Member George Berlin, who moved its adoption. The motion was seconded by Board Member Albert Huston, and upon being put to vote, the votes were as follows:

| | | |
|---|---|---|
| Board Member Jose Abreu | - | aye |
| Board Member George Berlin | - | aye |
| Board Member William Delgado | - | absent |
| Board Member Betty T. Ferguson | - | absent |
| Board Member Rafael Garcia-Toledo | - | aye |
| Board Member Seymour Gelber | - | absent |
| Board Member Albert Huston | - | aye |
| Board Member William Lehman | - | absent |
| Board Member Carlos A. Penin | - | aye |
| Board Member Kitty Roedel | - | absent |
| Board Member Steve Southerland | - | absent |
| **Vice-Chairperson Norman Wartman** | - | aye |
| **Chairperson Sonny Holtzman** | - | aye |

The Chairperson thereupon declared the resolution duly passed and adopted this 15th day of August 1996.

**Dade County Expressway Authority**

**(DCEA)**

By: _____

**Helen M. Cespedes**
**DCEA Secretary**

3

MDX00041

**Exhibit A to Resolution # 96-7 of Dade County Expressway Authority**

**Underwriting Team for Proposed Negotiated Sale of Bonds**

1  SENIOR MANAGER:

   PaineWebber

2  CO-SENIOR MANAGERS:

   Raymond James
   Howard Gary & Co.

3. CO-MANAGERS:

   Prudential Securities
   Smith Barney
   First Southwest
   William R. Hough
   Douglas James
   Grigsby Brandford

MDX00042



JAMES C. BURKE
COMMISSIONER

*Board of County Commissioners*
METROPOLITAN DADE COUNTY-FLORIDA
DISTRICT 2
STEPHEN P. CLARK CENTER
111 N. W. FIRST STREET
MIAMI, FLORIDA 33128-1963
(305) 375-4833

August 5, 1996

Mr. Howard Gary
President & CEO
Howard Gary & Company
3050 Biscayne Boulevard
Suite 603
Miami, FL 33137

Dear Mr. Gary:

In response to our discussion regarding your participation in the
Montenay $225,000,000, Series 1996 bond issue, please be informed
that as Chairman of the Metropolitan Dade County Finance
Committee, it is my understanding from Mr. Juan Portuondo of
Montenay and Mr. Grigsby of Grigsby Brandford & Company that your
firm's participation includes the underwriting and the
accompanying swap.

Our meeting with Mr. Calvin Grigsby, President and Chairman of
Grigsby Brandford & Company, who is senior managing this
transaction, to discuss this matter verified your participation
as previously mentioned. Specifically, Mr. Grigsby agreed that
your participation in the underwriting would be 25% and should
generate your firm $160,00. With regard to the accompanying swap,
Mr. Grigsby agreed that your firm and his firm would split
equally the revenues from the swap after the deduction of $500,00
for expenses.

As a locally headquartered minority owned firm, your
participation is in compliance with the county commission's
policy and is important to the development of local business .

If you have any further questions, please feel free to contact
me.

Sincerely,

James Burke
Commissioner, District 2

PLAINTIFF'S
EXHIBIT
6